# 24-1436-cv(L), 24-1567-cv(XAP)

## United States Court of Appeals
*for the*
## Second Circuit

ESTHER WILDER,

*Plaintiff-Appellant-Cross-Appellee,*

– v. –

SARAH HOILAND,

*Defendant-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT-CROSS-APPELLEE**

MATTHEW HERSH
MESTAZ LAW
*Attorneys for Plaintiff-Appellant-Cross-Appellee*
5090 North 40th Street, Suite 200
Phoenix, Arizona 85018
(602) 806-2068

COUNSEL PRESS (800) 4-APPEAL • (117007)

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

STATEMENT OF JURISDICTION ..... 1

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE ..... 2

I. Background. ..... 2

A. The importance of quantitative reasoning, faculty development, and learning assessment. ..... 2

B. Wilder creates a learning assessment plan for quantitative reasoning. ..... 4

C. Hoiland publishes Wilder's learning assessment plan under her own name. ..... 8

D. Wilder sues Hoiland for copyright infringement. ..... 24

II. Proceedings Below. ..... 26

SUMMARY OF ARGUMENT ..... 29

STANDARD OF REVIEW ..... 33

ARGUMENT ..... 34

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR HOILAND ON HER AFFIRMATIVE DEFENSE OF FAIR USE. ..... 34

A. The Purpose and Character of Hoiland's Use Weighs Heavily in Wilder's Favor Because Hoiland Did Not Transform Wilder's Work and Because Hoiland Benefitted Professionally From Her Use. ..... 34

1. Hoiland did not make a transformative use of Wilder's work. ..... 34

a. Hoiland and Wilder's works served the same fundamental purpose—to help college professors assess their QR instruction. ..... 34

b. In finding a transformative purpose, the district court made multiple errors. ..... 43

2. Hoiland's non-commercial educational purpose does not outweigh the non-transformative nature of her copying. .......... 58

B. The Amount and Substantiality of the Portion Used Tilts Heavily in Wilder's Favor. .......... 61

C. The Effect on the Market—Or in This Case, the Effect on Wilder's Academic Reputation and Publishing Opportunities—Also Weighs Against Fair Use. .......... 63

II. THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF FAIR USE. .......... 69

III. THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF OWNERSHIP. .......... 71

CONCLUSION .......... 74

CERTIFICATE OF COMPLIANCE .......... 75

CERTIFICATE OF SERVICE .......... 76

## TABLE OF AUTHORITIES

### Cases

*Aitken, Hazen, Hoffman, Miller, P. C. v. Empire Const. Co.*, 542 F. Supp. 252 (D. Neb. 1982) .......... 68

*Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1 (S.D.N.Y. 1992) .......... 59, 66

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .......... 30, 34, 35, 36, 37, 38, 39, 45, 47, 48, 54

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) .......... 35, 47, 48, 50

*Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537 (S.D.N.Y. 2013) .......... 40

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .......... 35, 46, 65

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) .......... 40, 41

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267 (6th Cir. 2009) .......... 45

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) .. 44, 61

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)30, 31, 36, 48, 59

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) .......... 52

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003) .......... 54, 55

*Folsom v. Marsh*, 9 F. Cas. 342 (C.C.D. Mass. 1841) .......... 36, 43, 51

*Foster v. Lee*, 93 F. Supp. 3d 223 (S.D.N.Y. 2015) (same) .......... 72

*Grant v. Trump*, 563 F. Supp. 3d 278 (S.D.N.Y. 2021) .......... 48

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) .......... 31, 32, 40, 52, 58, 69

*Horror Inc. v. Miller*, 15 F.4th 232 (2d Cir. 2021) .......... 72

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ...... 46, 57

*Lynk Media, LLC v. Peacock TV LLC*, 23-CV-5845 (JGK), 2024 WL 2057235 (S.D.N.Y. May 8, 2024) .......... 46

*Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983) .......... 65, 66

*Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986) .......... 65

*Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977) .......... 41, 42, 43

*Mullins v. City of N.Y.*, 653 F.3d 104 (2d Cir. 2011) .......... 33

*Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381 (6th Cir. 1996) .......... 44, 45

*Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981) .......... 67, 68

*Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) .......... 41

*Satchell v. Dilworth*, 745 F.2d 781 (2d Cir. 1984) (cleaned up) .......... 74

*SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301 (S.D.N.Y. 2000) .......... 72

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) .......... 59, 61

*VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723 (9th Cir. 2019) .......... 46

*Virginia Military Inst. v. United States*, 508 U.S. 946 (1993) .......... 49

*Weissmann v. Freeman*, 684 F. Supp. 1248 (S.D.N.Y. 1988) .......... 63, 64

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir. 1989) .......... 32, 60, 64

*Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) .......... 61

*Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574 (6th Cir. 2007) .......... 45

**Statutes**

17 U.S.C. § 101 .......... 73

17 U.S.C. § 106 .......... 53

17 U.S.C. § 106(5) .......... 53

17 U.S.C. § 201(a) .......... 71

17 U.S.C. §§ 101 et seq .......... 1

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

CTA2 Rule 32.1(b)(3) .......... 50

**Other Authorities**

Pierre N. Leval, Toward a Fair Use Standard, 103 Harvard L. Rev. 1105 (1990) .......... 40, 42, 43, 70

R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice (11th ed. 2019) .......... 53

## STATEMENT OF JURISDICTION

This case involves a claim of copyright infringement brought by Dr. Esther Wilder against Dr. Sarah Hoiland pursuant to the Copyright Act, 17 U.S.C. §§ 101 *et seq*. The district court had subject matter jurisdiction under 28 U.S.C. § 1331, & 28 U.S.C. § 1338. The district court entered judgment disposing of all of Wilder's claims on February 2, 2024. SPA-46. That judgment became final upon the district court's disposition, on April 24, 2024, of Wilder's motion to alter or amend judgment and Hoiland's motion for attorney fees. SPA-47. Wilder filed a timely notice of appeal on May 23, 2024. JA-718. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in granting summary judgment to Hoiland based on Hoiland's fair use defense.

2. Whether the district court erred in denying summary judgment to Wilder with respect to Hoiland's fair use defense.

3. Whether the district court erred in denying summary judgment to Wilder with respect to Wilder's claim of ownership.

## STATEMENT OF THE CASE

This is a copyright infringement action brought by Dr. Esther Wilder against Dr. Sarah Hoiland. The district court (Hon. P. Kevin Castel, J.) granted Hoiland's motion for summary judgment on her affirmative defense of fair use. The district court denied Wilder's motion for summary judgment on Hoiland's affirmative defense of fair use and on Wilder's claim of ownership.

### I. Background.

#### A. The importance of quantitative reasoning, faculty development, and learning assessment.

Drs. Esther Wilder and Sarah Hoiland specialize in a field called quantitative reasoning, or QR for short. The field is also known as "numeracy," which readers might find a more intuitive term. Literacy is about knowing how to use letters and words; numeracy is about knowing how to use numerical data. JA-246; JA-177.8. Teach people to read and write and you are teaching them literacy. Teach people to understand numbers and data—and to create logical arguments *out of* that data—and you are teaching them numeracy. JA-177.8; JA-65. You are teaching them to reason quantitatively. You are teaching them, in what will be the vernacular of this case, "QR."

But the professors involved in this case don't merely teach QR to their students. They also teach *how* to teach QR. They do that by running faculty development programs in which the teachers themselves become the students. These faculty development programs are essential because the teaching of QR, just like the studying of it, is its own special skill. QR is tied to upward social mobility, JA-247, but it can often be tricky for students to navigate—particularly those from underrepresented minority populations. JA-180. Teachers in the field must understand the unique needs of those underrepresented minorities—and must develop culturally responsive methods to address those needs. JA-110. For many in the academic world, it does not come naturally.

And the professors involved in this case don't stop at teaching how to teach QR. They also teach faculty members how to *assess* their teaching. Faculty development programs in all fields require training on the front end and evaluation on the back end. JA-110. That is known as "learning assessment." JA-167. Academics who teach in any field have to know whether all their teaching is bearing fruit. Assignments, quizzes and exams will give some hint of it. But there are more rigorous ways to discover what works and what doesn't work—all of which should be

components of a well-run faculty development program. And that—the training to do that very assessment—is at the core of this case.

### B. Wilder creates a learning assessment plan for quantitative reasoning.

1. Dr. Esther Wilder is a tenured professor in the Department of Sociology at Lehman College, The City University of New York. JA-46. A major focus of her academic research for the past two decades has been the development of methods for faculty to teach QR effectively to college students. JA-47. Many of her scholarly papers and other publications, projects and presentations have been related to this research. JA-47.

2. In 2011, Wilder was awarded a National Science Foundation grant of $600,000 for a faculty development project known as "NICHE," an abbreviation for "Numeracy Infusion Course for Higher Education." JA-47; JA-288. The grant money was funneled through the Research Foundation of the City of New York, but Wilder directed the project. JA-288; JA-47. The NICHE program was designed to teach faculty at CUNY about best practices for infusing quantitative reasoning into their own courses. JA-47; JA-223. Wilder developed and created most of the instructional material in the NICHE program. JA-47.

Wilder and her team created a faculty development program with eight different modules. JA-71; JA-110. Each module was designed so that it could be completed by faculty enrollees online in approximately five to six hours. JA-256; JA-395. Over the course of those eight modules, faculty members learned to articulate QR learning goals, to identify and implement best practices for teaching QR, and to develop strategies for incorporating QR into their own course instruction. JA-289. But the apex of the program was the assessment module. At that stage of the course, faculty members learned to evaluate their *own* QR teaching results—what worked, what didn't work, and what could be improved in the future. JA-289.

Wilder wrote this assessment portion—a component of the overall program that has frequently been referred to in this case as "Unit 7H." JA-48; JA-474. That component—by all accounts a key deliverable of the program, JA-73—is what Wilder named the "QR Assessment Plan/Instrument." JA-62. The genius of this component of the program is that it did not simply teach faculty members how to assess their work. It taught faculty members how to create their own *individualized* assessment plans—hand-tailored, literally, around their own subject

matter expertise and their own teaching priorities. JA-62. The assessment phase was the capstone to the program, JA-51, but it was also much more. It gave the program a life beyond the eight online sessions—one that faculty members could use to improve their QR teaching skills, and to evolve and adapt their QR teaching methods, over a lifetime of instruction.

Wilder's learning assessment component taught faculty members how to create this individualized plan. It began by asking them to think back to the learning goals they articulated in an earlier phase of the program. JA-62. It then asked them to articulate a set of questions and scoring formulas—"rubrics," in Wilder's phraseology—that would give feedback on whether they met each of their goals. JA-62. Finally, it guided faculty members through a set of questions designed to help sharpen their assessment instrument. For example: Are the assessment questions clear and straightforward? Do the skills assessed in the assessment instrument correspond to the instructor's own QR learning goals? What are the strengths and weaknesses of the QR assessment plan? Is the plan valid and sound? JA-63. In this way, Wilder's assessment plan explained, faculty members were trained to assess their

work "in a way that makes sense for [their] course and for [their] learning objectives." JA-63.

3. The NICHE program was a success—enough so that the NSF asked Wilder to continue her work. JA-48. The follow-on program bore a slightly altered name—NICE, or Numeracy Infusion for College Educators—and was limited to faculty and students at three Bronx-based Hispanic-serving institutions within the CUNY system. JA-49-50; JA-109. But while the name and target audience varied, the programs were in substance identical. The follow-on program used the same eight modules, and—most importantly—essentially identical text in Unit 7H. JA-52. For the purposes of this case, NICHE and NICE can be considered the same.

4. The NICHE program was a success in another way—it led to substantial publication opportunities for the academics involved in it. Wilder, for example, published several papers on the information learned from the NICHE assessment data and presented the research results of the NICHE program at academic conferences. JA-49; JA-123. One of those publications, a paper she co-authored with a colleague about "cognitive illusions," drew on just one of the eight modules (module three,

covering "cognition and QR") in the NICHE program. JA-123; JA-71. Wilder has also considered commercializing the entire NICHE plan of study, including Unit 7H, in a textbook. JA-60.

### C. Hoiland publishes Wilder's learning assessment plan under her own name.

1. Dr. Sarah Hoiland is a professor at Hostos Community College, a two-year community college that is part of the CUNY network. JA-245. Like Wilder, she is also dedicated to teaching QR to disadvantaged students. Though Hoiland was not an original member of NICHE, she agreed—at Wilder's invitation—to join the follow-on NICE program. JA-50. Wilder and Hoiland made two presentations together in the early years of the NICE program: one at the National Numeracy Network annual meeting and another at the Mathematical Association of America Metropolitan New York section Meeting. JA-54. At those conferences, Wilder and Hoiland presented an overview of the NICHE and NICE programs, shared research results, and highlighted plans to adapt NICHE to NICE. JA-54. At neither of these conferences did either present the text of Unit 7H—or of any of the NICHE/NICE training materials—to the attendees. JA-54.

2. In June 2018, right as the follow-on NICE program was scheduled to conclude, Hoiland applied to make a presentation at the February 2019 Community College Conference on Learning Assessment. JA-405. Hoiland, who has described the CCCLA as a "great conference" with a "semi-competitive proposal selection process," had been part of a team that tried and failed to present several years earlier. JA-408. The conference offered, in Hoiland's words, "an opportunity for community-college educators and administrators to improve their pedagogical skills." JA-261. Hoiland applied to present at the program because, she believed, "a conference on learning assessment for community faculty fit very well within the overarching project goals." JA-186.

3. Hoiland proposed to present at a session entitled "Assessing Numeracy in a Faculty Development program." JA-405. That session, Hoiland proposed, would "focus attention on strategies for assessing quantitative reasoning (QR) at community colleges." The audience for that session, Hoiland proposed, would be "Teaching Faculty." JA-405; JA-262. And of the three "primary learning objectives" Hoiland listed on her proposal, the first was: "To share best practices in faculty development

related to assessment." JA-405. Hoiland's application was accepted a month later. JA-167.

4. Hoiland created the very presentation she promised. JA-65. Her 23-page PowerPoint—which contained only her name and not Wilder's—was entitled "Assessing Numeracy in a Faculty Development program." JA-65. The cover page was followed by two pages of photographs, three pages that described the program in general terms, and one page with assessment data generated by the program. JA-66-71. The PowerPoint then arrived at what Hoiland termed its "key deliverable": Six pages about how to develop a QR assessment instrument. JA-73; JA-266.

The six-page deliverable on QR assessment walked faculty members at the conference through the steps required to create an assessment instrument. The first page gave a summary. JA-72. The next page asked faculty members to think back to the learning goals they articulated in earlier phases of the program. JA-73. The next page asked them to articulate a set of questions and scoring formulas—"rubrics," in the presentation's phraseology—that would give feedback on whether they met each of their goals. JA-74. The next three pages guided them through a set of questions designed to help sharpen their assessment

instrument. For example: Are the assessment questions clear and straightforward? Do the skills assessed in the assessment instrument correspond to the instructor's own QR learning goals? What are the strengths and weaknesses of the QR assessment plan? Is the plan valid and sound? JA75-JA76. In this way, Hoiland's PowerPoint made clear, faculty members would be trained to assess their work "in a way that makes sense for [their] course and for [their] learning objectives." JA74.

If the description of Hoiland's QR assessment "deliverable" sounds familiar to the reader, there is a good reason: it was copied nearly word for word from Wilder's copyrighted Unit 7H. Hoiland acknowledges this. JA-197-203. In fact, of the 19 pages of text in Hoiland's PowerPoint (excluding the four pages of photos), language pulled from Wilder's Unit 7H makes up five of those. Here is a comparison of the two works, with the identical text highlighted in yellow (an identical typographical error is also highlighted in red):

**Wilder's Unit 7H, Page 1 (JA-62)**

QR Assessment Instrument

Please restate your revised QR learning goals that you developed in this blog along with your QR assessment instrument. We ask that your QR assessment be simple and consist of 3 questions (or scoring rubrics) that directly correspond to the 3 learning goals you have articulated (if you are undertaking a pre-test/post-test design, you may want to develop two versions of the instrument). PLEASE KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/scoring rubrics, etc.!

You assessment instrument should be designed to measure whether or not (or the extent to which) your QR lesson/assignment succeeded in teaching students the 3 learning goals you put forward. The assessment should be designed to give feedback to you as an instructor! Please indicate when and how you plan to administer your assessment instrument.

**Hoiland's Conference PowerPoint, Page 9 (JA-73)**

**QR Assessment Instrument**

Please restate your revised QR learning goals that you developed in this blog along with your QR assessment instrument. We ask that your QR assessment be simple and consist of 3 questions (e.g., multiple choice questions or problems with accompanying scoring rubrics similar to the CAT) that directly correspond to the 3 learning goals you have articulated (if you are undertaking a pre-test/post-test design, you may want to develop two versions of the instrument, although we recognize that given where we are in the semester you may be unable to administer a pretest assessment at this point in time).

PLEASE KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/problems with scoring rubrics, etc.!

You assessment instrument should be designed to measure whether or not (or the extent to which) your QR lesson/assignment succeeded in teaching students the 3 learning goals you put forward. The assessment should be designed to give feedback to you as an instructor! Please indicate when and how you plan to administer your assessment instrument in your blog post!

**Wilder's Unit 7H, Page 2 (JA-63)**

Please note that there are examples of course-specific assessment instruments on our instructional materials from NICHE webpage.

Assessments can take a huge variety of forms and we encourage you to assess in a way that makes sense for your course and for your learning objectives. However, we also strongly encourage you to assess narrowly, specifically focusing on your QR lesson/assignment, rather than the course as a whole or the college experience as a whole.

Your assessment instrument should correspond to the learning goals that you have articulated and evaluate whether or not your course and/or your QR assignment/exercise effectively taught the QR skills you set out to teach. Since you have articulated 3 learning goals [in each of three areas, e.g., (a) Knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind], we ask you to develop a simple 3-question assessment instrument that gets at these 3 learning goals. In addition, a pre-test and post-test design may be helpful in assessing the effectiveness of your instruction.

**Hoiland's Conference PowerPoint, Page 10 (JA-74)**

Please note that there are examples of course-specific assessment instruments on our instructional materials from NICHE/NICE webpage.

Assessments can take a huge variety of forms and we encourage you to assess in a way that makes sense for your course and for your learning objectives. However, we also strongly encourage you to assess narrowly, specifically focusing on your QR learning goals, rather than the course as a whole or the college experience as a whole.

Since you have articulated 3 learning goals [in each of three areas, e.g., (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind], we ask you to develop a simple 3-question assessment instrument that corresponds to those 3 learning goals.

**Wilder's Unit 7H, Page 2 (JA-63)**

Guidelines for Developing and Providing Feedback on QR Assessment Instrument

(1) Does the assessment instrument (or instruments if there are two versions) include 3 questions (or scoring rubrics, etc.) that are clear and straightforward?

(2) Can (and how will) the results of the assessment plan and instrument be used to evaluate whether the instructor effectively taught specific QR skills and/or achieved his or her QR learning goals? How do the skills assessed in the instrument correspond to the QR learning goals articulated by the instructor as well as those taught in the QR lesson plan in terms of (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind?

**Hoiland's Conference PowerPoint, Page 11 (JA-75)**

**Guidelines for Developing and Providing Feedback on QR Assessment Instrument**

(1) Does the assessment instrument (or instruments if there are two versions) include 3 questions (or scoring rubrics, etc.) that are clear and straightforward?

(2) Can (and how will) the results of the assessment plan and instrument be used to evaluate whether the instructor effectively taught specific QR skills and/or achieved his or her QR learning goals? How do the skills assessed in the instrument correspond to the QR learning goals articulated by the instructor as well as those taught in the QR lesson plan in terms of (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind?

**Wilder's Unit 7H, Page 2 (JA-63)**

(3) What are the strengths and weaknesses of the QR assessment plan and instrument? Please indicate at least one way in which the assessment instrument could be improved. In responding to this question, please consider the following:

(a) Will the assessment plan be able to evaluate the effectiveness of the QR lesson plan (including assignments, readings, etc.)? For example, does the instructor plan to use a pre-test/post-test design, is there a comparison group, etc.

(b) Does the QR assessment instrument extend beyond just being a math skills test and emphasize the ability to reason with quantitative information?

(c) Is the assessment instrument valid (i.e., does it get at what the instructor is trying to measure)?

(d) Is the instrument sound? For example, if the instrument relies on multiple choice questions, are the response options mutually exclusive and is the correct answer clearly identifiable? If the assessment instrument (or a specific question) relies on a rubric, do the scoring criteria make sense and will the exercise authoritatively assess a QR skill (or skills)?

**Hoiland's Conference PowerPoint, Page 12 (JA-76)**

(3) What are the strengths and weaknesses of the QR assessment plan and instrument? Please indicate at least one way in which the assessment instrument could be improved. In responding to this question, please consider the following:

(a) Can the assessment be used to evaluate the effectiveness of the QR lesson plan (including assignments, readings, etc.)? For example, does the instructor plan to use a pre-test/post-test design, is there a comparison group, etc.

(b) Does the QR assessment instrument extend beyond just being a math skills test and emphasize *the ability to reason with quantitative information?*

(c) Is the assessment instrument valid (i.e., does it get at what the instructor is trying to measure)?

(d) Is the instrument sound? For example, if the instrument relies on multiple choice questions, are the response options mutually exclusive and is the correct answer clearly identifiable? If the assessment instrument (or a specific question) relies on a rubric, do the scoring criteria make sense and will the exercise authoritatively assess a QR skill (or skills)?

**Wilder's Unit 7H, Page 2 (JA-63)**

(4) Is the assessment instrument independent of the course QR lesson(s)/assignment(s)? In other words, can it be used to evaluate the effectiveness of the QR lesson(s)/assignment(s)?

**Hoiland's Conference PowerPoint, Page 13 (JA-77)**

(4) Is the assessment instrument **independent** of the course QR lesson(s)/assignment(s)? In other words, can it be used to evaluate the effectiveness of the QR lesson(s)/assignment(s)?

5. In making her derivative of Wilder's document, Hoiland took pains to highlight the elements of Wilder's work that she found especially valuable. Hoiland did this by clipping out certain phrases and copying them into the bottom of some of her slides. JA-191; JA-199. She did this, in her words, to provide "specific advice" to faculty attendees regarding "creation of the assessment instrument" and "giving feedback on [those] assessment instruments." JA-267. This "advice" consisted, for all intents and purposes, of Wilder's own words. For example, on the left side of the box below is an excerpt from page 2 of Wilder's Unit 7H with the following phrases highlighted for the reader: "keep your assessment instrument simple," "3 questions," "scoring rubrics," and "pre-test/post-test." On the right is page 10 of Hoiland's PowerPoint, which has essentially scissored out the same phrases and pasted them into a purple-highlighted section at the bottom: "Keep it simple: pre/post, three questions, and a scoring rubric."

| ***Wilder's Original*** | ***Hoiland's PowerPoint*** |
|---|---|
| Page 1 (JA-62) | Page 10 (JA-74) |



To create your own blog, please select "new entry" (there are guidelines for creating your QR assessment instrument below). Please note that if you wish to attach a file to your blog you may do this by selecting the icon in the final row that is third from the left!

Please note that each participant should create a separate blog (to allow for peer feedback) in doing this!

QR Assessment Instrument

Please restate your revised QR learning goals that you developed in this blog along with your QR assessment instrument. We ask that your QR assessment be simple and consist of 3 questions (or scoring rubrics) that directly correspond to the 3 learning goals you have articulated (if you are undertaking a pre-test/post-test design, you may want to develop two versions of the instrument). PLEASE KEEP YOUR ASSESSMENT INSTRUMENT SIMPLE and include only 3 questions/scoring rubrics, etc.!

You assessment instrument should be designed to measure whether or not (or the extent to which) your QR lesson/assignment succeeded in teaching students the 3 learning goals you put forward. The assessment should be designed to give feedback to you as an instructor! Please indicate when and how you plan to administer your assessment instrument.

Please consider the guidelines for developing and providing peer review on assessment instruments (see below) as you adapt/develop your own!



QR ASSESSMENT—KEY DELIVERABLE

**QR Assessment Instrument**

Please note that there are examples of course-specific assessment instruments on our instructional materials from NICHE/NICE webpage.

Assessments can take a huge variety of forms and we encourage you to assess in a way that makes sense for your course and for your learning objectives. However, we also strongly encourage you to assess narrowly, specifically focusing on your QR learning goals, rather than the course as a whole or the college experience as a whole.

Since you have articulated 3 learning goals [in each of three areas, e.g., (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind], we ask you to develop a simple 3-question assessment instrument that corresponds to those 3 learning goals.

**Keep it simple: pre/post, three questions, and a scoring rubric**

Hoiland did the same just a few slides later. On the left side is an excerpt from page 2 of Wilder's Unit 7H with the following words and phrases highlighted for the reader: "clear," "correspond," "extend beyond just being a math skills test," "valid," and "sound." On the right is page 13 of Hoiland's PowerPoint, which has again scissored out the same words and phrases (with only minor alterations) and pasted them into a green-highlighted section at the bottom: "Clarity, alignment, generalizability, validity, and soundness."

***Wilder's Original***

Page 1 (JA-62)


(1) Does the assessment instrument (or instruments if there are two versions) include 3 questions (or scoring rubrics, etc.) that are clear and straightforward?

(2) Can (and how will) the results of the assessment plan and instrument be used to evaluate whether the instructor effectively taught specific QR skills and/or achieved his or her QR learning goals? How do the skills assessed in the instrument correspond to the QR learning goals articulated by the instructor as well as those taught in the QR lesson plan in terms of (a) knowledge and conceptual understanding; (b) thinking and other skills; and (c) attitudes, values, dispositions and habits of mind?

(3) What are the strengths and weaknesses of the QR assessment plan and instrument? Please indicate at least one way in which the assessment instrument could be improved. In responding to this question, please consider the following:

(a) Will the assessment plan be able to evaluate the effectiveness of the QR lesson plan (including assignments, readings, etc.)? For example, does the instructor plan to use a pre-test/post-test design, is there a comparison group, etc.

(b) Does the QR assessment instrument extend beyond just being a math skills test and emphasize the ability to reason with quantitative information?

(c) Is the assessment instrument valid (i.e., does it get at what the instructor is trying to measure)?

(d) Is the instrument sound? For example, if the instrument relies on multiple choice questions, are the response options mutually exclusive and is the correct answer clearly identifiable? If the assessment

***Hoiland's PowerPoint***

Page 13 (JA-77)


QR ASSESSMENT FEEDBACK GUIDELINES

**Guidelines for Developing and Providing Feedback on QR Assessment Instrument**

(4) Is the assessment instrument **independent** of the course QR lesson(s)/assignment(s)? In other words, can it be used to evaluate the effectiveness of the QR lesson(s)/assignment(s)?

Clarity, alignment, generalizability,

validity, and soundness

Hoiland's PowerPoint differed from Wilder's copyrighted document in other ways. For example, in one place, the PowerPoint italicized the phrase "the ability to reason with quantitative reasoning." In another place, the PowerPoint bolded the word "independent." Hoiland did not actually make these changes herself; rather, she borrowed them from a version of Unit 7H that Wilder had slightly updated from the original NICHE materials. JA-268; JA-51) Hoiland's version also contained small variations from the wording to the copyrighted text, mostly additions or deletions in parentheticals or variations in line spacing. Again, this was a byproduct of the fact that she borrowed from a slightly later version of Unit 7H—she did not make these changes herself. *Supra* at 19.

6. But Hoiland did more than reproduce (and make a derivative of) Wilder's work. She also authorized the *distribution* of Wilder's work. When Hoiland signed up to present at the Orlando conference, she signed an intellectual property license and release. In doing so, she purported to grant the conference organizers a license to "use, copy and distribute" her written PowerPoint presentation. JA-165. The license specifically acknowledged that the conference organizers would be "posting [the PowerPoint] online for downloading on the [c]onference website and mobile application for [c]onference participants." JA-165. (The conference organizers also made the same thing clear to Hoiland by email. JA-167.) Hoiland complied with this obligation by providing the PowerPoint in advance. JA-269.

Consistent with this purported license, the conference organizers then published Wilder's work to all 237 conference attendees by posting it on the website of the conference. JA-172; JA-238; JA-492. The conference organizers also continued to maintain the "official copy" of the presentation in their files well after the conference was done, JA-172—enabling them to at any time reprint that work, share it with other

scholars, or even market it as a part of a scholarly monograph or edited volume.

7. In preparing for the conference, Hoiland made one last-minute change to her written presentation. At the request of the conference presenters, she changed the font of slides 9-13 (the ones that she had copied from Wilder) to make the font bigger so that it could be more easily read by the conference attendees. JA-216-217. Hoiland's change in font size ensured that the copied text would be the same size as the other slides. Of the 14 pages of text not copied from Wilder, seven of them—or half—were the same size as page 10. A comparison is presented below, with page 9 of the PowerPoint (copied from Wilder) on the left and page 14 of the PowerPoint (not copied from Wilder) on the right. Pages 15, 16, 17, 18, 19, 20 have text that is the same size as the text of Page 14. JA-79; JA-80; JA-81; JA-82; JA-83; JA-84.

***Hoiland's PowerPoint***

Page 9 (JA-73)
(copied from Wilder)




Page 14 (JA-78)
(not copied from Wilder)




In expanding Wilder's text right before her presentation, Hoiland also made the choice to blow up one page even more than the others. Text copied from Wilder made up pages 9-13 of the PowerPoint. JA-73-77. But Hoiland chose to make page 10—the second page taken from Wilder—even larger than others. The text on that page, as a result, all but dwarfed the text not taken from Wilder:

### *Hoiland's PowerPoint*

Page 10 (JA-74)
(copied from Wilder)




Page 14 (JA-78)
(not copied from Wilder)




8. Hoiland displayed her PowerPoint onscreen, one page after the other, to the attendees of her presentation. JA-269. Hoiland's display of the work—including the portion she took from Wilder—was substantial. She displayed pages of Unit 7H specifically to show attendees what the course materials looked like "and the types of questions Faculty Participants were asked to answer in preparing their assessment materials." JA-268. The 75-minute presentation covered roughly 45 minutes for the slides and 30 minutes for follow-up questions and answers. JA-167-68; JA-210. During her presentation, as Hoiland has explained, she discussed with attendees "how faculty participants both create and revise a QR assessment instrument[] and provide feedback to at least one other faculty participant on that participant's QR assessment

instrument." JA-267 (capitalizations removed). She also showed attendees "the types of questions faculty participants were asked to answer in preparing their assessment materials." JA-267 (capitalizations removed).

9. Hoiland has not hesitated to leverage the value of this presentation to her academic career. She has listed her presentation at the conference on her CV and in her applications for grants and awards. JA-294. Wilder, meanwhile, is fearful that if she publishes her own work under her own name now, "it may appear to others that I had plagiarized [Hoiland's] work, rather than the other way around." JA-60.

### D. Wilder sues Hoiland for copyright infringement.

Wilder registered her copyright in the version of Unit 7H that she drafted for the NICHE program and then filed this lawsuit on February 9, 2022. Hoiland, acting *pro se* at the time but with the assistance of counsel, answered the complaint on April 8. JA-14-JA-20 Hoiland's answer brought what it termed the "defenses" of implied license and fair use. JA-16; JA-20. The answer also asserted, as a "defense," that Wilder could not "establish that she created or was otherwise the owner" of the work at issue or that such materials were "sufficiently original" to

warrant copyright protection. JA-20. The answer made no mention of the affirmative defense of work for hire. Hoiland did not at any time amend her answer.

After discovery, both parties moved for summary judgment. Wilder's motion sought summary judgment on the copyright infringement claim on the grounds that she owned the copyright in Unit 7H, that Hoiland copied that work, and that Hoiland's copy was substantially similar. JA-21. Wilder also sought summary judgment in her favor on Hoiland's defense of lack of ownership, arguing that Unit 7H was sufficiently original to be copyrightable and that she owned the copyright in that work. JA-38. Finally, Wilder sought summary judgment in her favor on Hoiland's defenses of implied license and fair use. JA-38-44.

Hoiland responded to Wilder's summary judgment motion and simultaneously cross-moved for summary judgment in her favor. JA-454. Hoiland's briefing papers opposed summary judgment in Wilder's favor only on the grounds of implied license and fair use. JA-476-481. The briefing papers therefore conceded (by not addressing the issues) Wilder's claims of authorship, originality, and ownership. As to Hoiland's own

motion, she sought summary judgment in her favor solely on the grounds of the affirmative defenses of implied license and fair use.

## II. Proceedings Below.

The district court (P. Kevin Castel, J.) granted Hoiland's summary judgment on the ground of fair use and denied Wilder's summary judgment on the same issue. SPA-1. The court also denied Wilder's summary judgment on the issue of ownership. SPA-1. The court did not rule on the issue of implied license.

The district court first addressed Wilder's summary judgment motion on the issue of ownership. The court took it for granted that Wilder was the author of the text and assumed, without deciding, that her work was original. SPA-20. Nonetheless, the court denied the motion. SPA-20. The court identified two principal grounds for doing so. First, the court found, although the NSF "normally" allows grantees to retain the rights to intellectual property generated under their grants, Wilder had not shown that this policy was specifically in effect for the NICHE grant. SPA-24. Moreover, the court reasoned, the grantee in this case was technically CUNY and not Wilder—and Wilder had not explained "by

what path copyright ownership would pass, under this scenario, from []CUNY as the NSF grantee to her as the 'author' of the work." SPA-25.

The district court then turned to the issue of fair use. The court found that the first fair use factor, the purpose and character of the use, tilted in Hoiland's favor because she used it in a non-commercial, educational setting and because she made a "transformative" use of the work. SPA-29. Hoiland made a transformative use, the court reasoned, because there was a "larger story" that Hoiland was telling in her presentation. SPA-30. In addition to talking about best practices in faculty development relating to assessment, the court found, Hoiland also used her PowerPoint to disseminate assessment results and discuss "the challenges and successes related to assessment in the community." SPA-30. The court also reasoned that Hoiland had shown transformative use because the PowerPoint slides were not the "focus" of her presentation, the audience members asked questions "almost wholly unrelated to the slides themselves," Hoiland omitted some of Wilder's text and made minor changes to the rest of it, and Wilder would have objected to Hoiland's use of her materials. SPA-30-33.

The district court found that the rest of the factors, taken collectively, supported a finding of fair use. The court found that the second factor, the nature of the copyrighted work, weighed in favor of Hoiland because Wilder's work was "not a work of fiction." SPA-36. The court found that the third factor, the amount and substantiality of the portion used, weighed in favor of Wilder because Hoiland took about two-thirds of her copyright materials. SPA 39-40. However, this factor weighed only "slightly" in favor of Wilder, the court found, because Hoiland cut out much of the copyrighted text that "would have been 'essential' or the 'heart' of the work." SPA-39. Finally, as to the fourth factor, effect on the market, the court found that Wilder had not established that the infringement caused a "detriment" to her own "publications, promotions, or incentives to continue her scholarly research." The court reached this conclusion because it found that Hoiland used the work only one time in front of a small audience and because the potential market for Wilder's work, standing alone, would be limited. SPA-41-42.

The district court then denied Wilder's motion to alter or amend the judgment. SPA-47. The district court's opinion this time downplayed the

question of whether Hoiland's work was transformative, noting that "whether a use is transformative is not dispositive to the fair use analysis." SPA-50. Thus, the court held, even if Hoiland did not make a transformative use of Wilder's work, "her non-commercial, educational use weighed in her favor." SPA-51. As to the fourth factor, the court rejected Wilder's argument that it had erred by "placing the burden on Wilder to show market harm." SPA-51. Here, the court found, the fourth factor weighed in Hoiland's favor because there was "essentially unrebutted" evidence in the record that showed that Wilder's claimed harm was speculative or unlikely. SPA-51. The court also declined to alter its conclusion that Hoiland's use of Wilder's work was transformative, rejecting Wilder's contention that it had erred by focusing only on Hoiland's display of the slides instead of examining the written work. SPA-51-52.

## SUMMARY OF ARGUMENT

This case involves a straightforward application of the fair use doctrine. Wilder wrote a lesson plan to train faculty members how to assess their effectiveness in teaching quantitative reasoning, or QR. Hoiland purloined that lesson plan, put her own name on it, combined it

with other documents in a PowerPoint, and published it to 237 other academics who participated in a prominent national conference on learning assessment. It should have been a straightforward case of copyright infringement. But the district court mistakenly found that Hoiland was entitled to the defense of fair use. The decision should be reversed.

Hoiland's use of Wilder's lesson plan was not transformative. Under *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023), a secondary work is transformative if it has a fundamentally different purpose from the original. That usually requires some *justification* for the appropriation. Hoiland had none. She did not comment on Wilder's paper, criticize it, parody it, report on it, or do any of the other things that are at the core of fair use doctrine. Her PowerPoint gave no hint that the work belonged to someone else at all. If she needed to include a lesson plan in her presentation, she could have simply written her own. But instead, she tried to avoid "the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). That does not qualify as a fair use.

And it does not matter that Hoiland made a non-commercial and academic use of Wilder's work. "The mere fact that a use is educational and not for profit does not insulate it from a finding of infringement." *Campbell*, 510 U.S. at 584. The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but "*whether the user stands to profit* from exploitation of the copyrighted material without paying the customary price." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985). Hoiland profited by gaining valuable publication opportunities, grant opportunities, and career recognition as a result of her presentation. That might not have mattered if her PowerPoint had been a transformative use of Wilder's work. But there was no transformative use here. Hoiland cannot escape liability just because she works in academia. Binding authority in this Circuit—and two others, at least—make that clear. The district court ignored, or misread, that authority.

None of the other fair use factors excuse Hoiland's taking here. Wilder's work was indeed nonfictional, but the second factor has never played a meaningful role in fair use analysis. Some two-thirds of Wilder's work was copied into Hoiland's—tilting the third factor decidedly against

fair use. As to the fourth factor, effect on the market, it has been the authority in this Circuit for over three decades that in cases of academic misappropriation like this one, the plaintiff need not show market effect to defeat a fair use defense. *Weissmann v. Freeman*, 868 F.2d 1313, 1325-26 (2d Cir. 1989). If anything, that doctrine applies with even more force today.

The facts of this case are so clear—and in almost every respect undisputed—that this Court should not stop at reversing the grant of summary judgment on fair use to Hoiland. This Court has the authority not only to reverse the grant of Hoiland's motion but to find as a matter of law that Hoiland's use does not qualify as a fair use work. *Harper & Row*, 471 U.S. at 506. That should be the case here. There is no set of facts that a jury could reasonably find that would establish that Hoiland's use met the standard—when properly applied—for fair use. Wilder is entitled to summary judgment in her favor.

Finally, the district court should also be reversed on the issue of ownership. Wilder wrote the work at issue, making a *prima facie* case of ownership. Hoiland never asserted any reason why Wilder, as the author of the work, should not now own it. She did not even oppose Wilder's

motion for summary judgment on this issue at all. But the district court invented an argument for Hoiland anyway, postulating that perhaps ownership was in the hands of Wilder's employer or the public entity that funded her scholarship. But that was a work-for-hire defense—an *affirmative* defense that Hoiland never once raised and had since waived. And even if it had been properly raised, the defense was Hoiland's burden to prove, not Wilder's burden to disprove. But the district court pulled the defense out of thin air and then asked whether *Wilder* had come forward with the evidence. That, too, was reversible error.

## STANDARD OF REVIEW

The district court's grant of summary judgment to Hoiland on her affirmative argument of fair use defense is reviewed *de novo*, construing the evidence in the light most favorable to Wilder and drawing all reasonable inferences in Wilder's favor. *Mullins v. City of N.Y.*, 653 F.3d 104, 113 (2d Cir. 2011).

The district court's denial of summary judgment to Wilder on Wilder's claim of ownership and Hoiland's defense of fair use is reviewed *de novo*, construing the evidence in the light most favorable to Hoiland and drawing all reasonable inferences in Hoiland's favor. *Id.*

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT FOR HOILAND ON HER AFFIRMATIVE DEFENSE OF FAIR USE.

### A. The Purpose and Character of Hoiland's Use Weighs Heavily in Wilder's Favor Because Hoiland Did Not Transform Wilder's Work and Because Hoiland Benefitted Professionally From Her Use.

#### 1. Hoiland did not make a transformative use of Wilder's work.

##### a. Hoiland and Wilder's works served the same fundamental purpose—to help college professors assess their QR instruction.

1. Any fair use analysis must begin with *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023). In that case, Newsweek Magazine hired Lynn Goldsmith to photograph the musician Prince after one of his concerts in 1981. Goldsmith licensed Andy Warhol to make a derivative of her photograph, in his signature silkscreen mesh style, for use in Vanity Fair. But unbeknownst to Goldsmith, Warhol secretly made 15 more derivatives of her work. Thirty-five years later, after Prince's death, the Warhol Foundation licensed one of those derivatives to Vanity Fair for use in a special edition dedicated to the late artist. This Court found that that last use—the licensing to Condé Nast

for use in the special edition—did not constitute fair use. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) ("Warhol Second Circuit"). The Supreme Court agreed.

The Supreme Court's opinion in *Warhol* emphasized that courts must steer away from "an overbroad concept of transformative use" that would embrace "any further purpose or any different character." *Id.* at 529. The question at the heart of transformative use has been described as whether the use "merely supersedes the objects of the original creation, supplanting the original, or instead adds something new, with a further purpose or different character." *Id.* at 527-28 (cleaned up). But whether a use shares the purpose or character of an original work, or instead has a further purpose or different character, the Court emphasized, "is *a matter of degree*." *Id.* at 528 (emphasis added).[1] Most copying has some further purpose, the Court noted, "in the sense that copying is socially useful ex post." *Id.* at 528-59. Many secondary works,

[1] *Cf. Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Leval, J.) ("The word 'transformative' cannot be taken too literally as a sufficient key to understanding the elements of fair use. It is rather a suggestive symbol for a complex thought, and does not mean that any and all changes made to an author's original text will necessarily support a finding of fair use.")

therefore, "add something new." *Id.* at 529. But "[t]hat alone does not render such uses fair," the Court made clear. *Id.* "Rather, the first factor asks "whether *and to what extent* the use at issue has a purpose or character different from the original." *Id.* (emphasis in original).

Central to the transformative use analysis, the Court emphasized, is that the first factor "relates to the *justification* for the use." *Id.* at 532 (emphasis added).[2] A particular use may be justified, the Court explained, "because copying is reasonably necessary to achieve the user's new purpose." *Id.* Parody, for example, "needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing."[3] *Id.* (internal citation omitted). Similarly, "commentary or criticism that targets an original work may have a compelling reason to conjure up the

---

[2] *Cf. Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) ("The question, then, is, whether this is a justifiable use of the original materials, such as the law recognizes as no infringement of the copyright of the plaintiffs."); Leval at 1111 (1990) ("Factor One's direction that we consider the purpose and character of the use raises the question of justification") (cleaned up)..

[3] *Quoting Campbell,* 510 U.S. at 581.

original by borrowing from it." *Id.* (cleaned up). And Warhol's famous Soup Cans artwork, the Court noted, not only had a purpose that was completely unrelated to the original Campbell's tomato soup logo—"orthogonal," in the Court's wording, *id.* at 539—but also specifically "*target[ed]*" that logo. *Id.* at 539-40 (emphasis added). That is, the Court reasoned, the original copyrighted work was, "at least in part, the object of Warhol's commentary." *Id.* at 540.

2. Under this doctrine, the Court found, the Warhol Foundation's use of Goldsmith's photograph was not transformative. *Id.* at 535. Goldsmith created her photograph of Prince in 1981 to accompany a Newsweek story about an up-and-coming musician. The Foundation licensed Warhol's derivative in 2016 to accompany a Vanity Fair tribute edition upon that musician's death. "In that context," the Court reasoned, "the purpose of the image is substantially the same as that of Goldsmith's photograph. Both are portraits of Prince used in magazines to illustrate stories about Prince." *Id.*

In reaching its opinion, the Court emphasized that the first factor does not simply "weigh[] in favor of any use that adds some new expression, meaning, or message." *Id.* at 541. The district court had

found, in words echoed by the Foundation on appeal, that Warhol's derivative "[could] reasonably be perceived to have transformed Prince from a vulnerable, uncomfortable person to an iconic, larger-than-life figure." *Id.* at 545 (internal quotation omitted). But under that reading, the Court noted, "transformative use would swallow the copyright owner's exclusive right to prepare derivative works." *Id.* at 541. "Many derivative works, including musical arrangements, film and stage adaptions, sequels, spinoffs, and others that recast, transform or adapt the original," the Court reasoned, "add new expression, meaning or message, or provide new information, new aesthetics, new insights and understandings." *Id.* Fair use provided breathing space for works that genuinely transform, not "merely repackag[e]," the original. *Id.*[4]

3. *Warhol* dooms Hoiland's claim of transformative use in this case. Wilder created a document entitled a "QR Assessment Plan/Instrument," JA-62, in order to train college faculty members how to assess the effectiveness of their QR teaching, assembled it with other materials into a PowerPoint she titled "Assessing Numeracy in a Faculty Development

[4] *Quoting* Leval at 1111; *see also id.* ("A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test").

program," brought it to a conference of community college faculty members, and used it to train those faculty members in "best practices in faculty development related to assessment." JA-405. "In that context, the purpose of the [PowerPoint] is substantially the same as that of [Wilder's work]. Both are [training materials] used in [training sessions] to [train faculty members about assessing QR]." *Warhol*, 598 U.S. at 535.

Hoiland did not have any justification for using Wilder's work in her presentation. Her PowerPoint did not comment on Wilder's work. It did not criticize Wilder's work. It did not parody Wilder's work. It did not even acknowledge that Wilder had written anything in the PowerPoint *at all*. Hoiland could have, if she had wanted to, composed her own QR learning assessment lesson plan for her PowerPoint—and her PowerPoint could have achieved the same effect. But instead, she merely "repackage[d]" the original, Pierre N. Leval, Toward a Fair Use Standard, 103 Harvard L. Rev. 1105, 1111 (1990) ("Leval"), to save herself the time and effort. That did not remotely transform Wilder's work into "something new, with a further purpose or different character." *Warhol*, 598 U.S. at 528. Rather, her use "merely supersede[d] the objects of the original creation, supplanting the original." *Id.*

4. Hoiland's use of Wilder's work was non-transformative for three other reasons. For one thing, the text of Wilder's Unit 7H made up five out of the 23 pages of Hoiland's PowerPoint. That is of critical importance under this Circuit's doctrine. "The extent to which *unlicensed* material is used in the *challenged* work can be a factor in determining whether [an infringer's] use of original materials has been sufficiently transformative to constitute fair use." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (emphasis added).[5] The court should not have overlooked this use.

This consideration weighs heavily against any claim of transformative use. In *Harper & Row*, a magazine lifted portions of a book. The purloined language made up 13% of the challenged article. The Supreme Court found that this percentage weighed against fair use. 471 U.S. at 548-59. *See also Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (subsequent history omitted) (fact that purloined letters

[5] *See also Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) ("In considering whether the second work has transformed the original, it is appropriate to consider the percentage of the allegedly infringing work that is made up of the copyrighted work since this offers some indication of whether the defendant's use of the original materials has been sufficiently transformative.") (cleaned up).

were quoted or paraphrased on approximately 40% of the challenged book's 192 pages weighed against fair use); *cf. Bill Graham Archives*, 448 F.3d at 611 (characterizing the infringement in *Harper & Row* and *Salinger* as "wholesale takings").[6] Here, the purloined language made up 22% of Hoiland's PowerPoint—comfortably within the range of what this Court has defined as "wholesale" infringement. The transformative use factor weighs even more heavily against Hoiland as a result.

And Wilder's work was not only a large portion of Hoiland's PowerPoint in mathematical terms—it was also the *heart* of it. That, too, is critical under this Circuit's doctrine. *See Meeropol v. Nizer*, 560 F.2d 1061, 1071 (2d Cir. 1977) (reversing summary judgment in favor of fair use) ("Although these letters represent less than one percent of [an infringing book], the letters were prominently featured in promotional material for the book."). Wilder's Unit 7H, copied essentially word-for-

---

[6] *Bill Graham Archives* cleared up some ambiguity over just what factor this percentage was applicable to. In *Harper & Row* and *Salinger*, the courts considered this figure as relevant to the third factor. But in *Bill Graham Archives*, this Court clarified that the percentage of the challenged work that was made up of the purloined work was relevant to *transformative use* analysis, not third-factor analysis. 448. F.3d at 611 ("We find this inquiry more relevant in the context of first-factor fair use analysis.").

word by Hoiland, was the first substantive section of the PowerPoint, JA-73-77; JA-266—the section that Hoiland herself labeled a "key deliverable" of her presentation. JA-73. It was the only section of the PowerPoint that accomplished Hoiland's primary objective of "shar[ing] best practices in faculty development related to assessment." JA-405. And it was the only portion of Hoiland's PowerPoint that actually taught its readers how to "Assess[] Numeracy in a Faculty Development Program"—the very *title* of Hoiland's work. JA-65. Wilder's work was not merely "prominently featured" in Hoiland's PowerPoint, *Meeropol*, 560 F.2d at 1071—it was the centerpiece of it.

Finally, Wilder's Unit 7H was not merely the key deliverable of Hoiland's PowerPoint. It was also featured as a *distinct* (albeit unidentified) sub-unit in Hoiland's work. That, too, is telling. As Justice Story noted over two centuries ago:

> In some cases, a considerable portion of the materials of the original work may be fused, if I may use such an expression, into another work, so as to be undistinguishable in the mass of the latter, which has other professed and obvious objects, and cannot fairly be treated as a piracy; *or they may be inserted as a sort of distinct and mosaic work, into the general texture of the second work, and constitute the peculiar excellence thereof, and then it may be a clear piracy*.

*Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (emphasis added); *see also Meeropol*, 560 F.2d at 1070 (adopting doctrine). Wilder's Unit 7H formed just this "distinct and mosaic work" within Hoiland's PowerPoint—and it constituted "the peculiar excellence thereof." There was no transformation here.

#### b. In finding a transformative purpose, the district court made multiple errors.

##### i. The district court found a fair use merely because Hoiland sandwiched Wilder's work between other materials.

1. The district court committed a wide range of errors in finding that Hoiland transformed Wilder's work. The first was to inflate a modest difference in purpose into a transformational use. Wilder's original work, the court found, was intended to train faculty members enrolled in the NICHE program to do two things: compose individualize assessment instruments as part of their coursework and, more broadly, to think about "best practices for teaching and assessing QR." SPA-30. By contrast, the court found, Hoiland not only shared best practices for teaching and assessing QR in her presentation but also incorporated materials intended to "disseminate assessment results" of the program and to "discuss the challenges and successes" of the program. SPA-30.

Thus, the court reasoned, Hoiland's overall purpose was broader than Wilder's, as it was aimed at "providing an overview of the NICHE/NICE project to an audience who was previously unfamiliar with it." SPA-34. This was reversible error.

2. The court's analysis was mistaken on many levels. For one, the mere fact that Hoiland had more than one purpose in distributing Wilder's work does not make her use any more fair. If that were the case, anyone could claim fair use by packaging an infringing use with uses that did not infringe. *See, e.g., Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1263 n.21 (11th Cir. 2014) (copying of excerpts of textbooks for use in university courses *non-transformative because it was "for the same purpose*—or one of the purposes, insofar as some of Plaintiffs' works may also be meant for other purposes—as Plaintiffs' original works") (emphasis added). "This kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis [required for transformative use]." *Princeton Univ. Press v. Michigan Document Services, Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996). But the district court allowed Hoiland to do just that.

The district court's approach opens the door for endless mischief. A recording artist who samples another work without permission would get away with the infringement because he surrounded it with original content in the same song. *Cf. Bridgeport Music, Inc. v. UMG Recordings, Inc.,* 585 F.3d 267, 278 (6th Cir. 2009) (using classic "Atomic Dog" theme in another song not fair use as a matter of law, even though taking "consisted of relatively small elements of the song").[7] A company that purloins a textbook and markets it as part of a "course packet" would be free to do so as long as it packaged it with other, non-infringing works. *Cf. Princeton*, 99 F.3d at 1389 ("If you make verbatim copies of 95 pages of a 316–page book, you have not transformed the 95 pages very much—even if you juxtapose them to excerpts from other works and package everything conveniently."). A company that assembles infringing musical works into "karaoke packages" for individual crooners to overlay their own renditions would not pay any price for doing so. *Cf. Zomba Enterprises, Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 583 (6th Cir. 2007) (rejecting transformative use). A company that assembles real

[7] *See also Warhol*, 598 U.S. at 547–48 ("musician who finds it helpful to sample another artist's song to make his own" does not engage in transformative use)

estate photos into a searchable database would face no consequences. *Cf. VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 741-742 (9th Cir. 2019) (same). And a company that takes footage of a notorious press conference about voter fraud would face no consequence by incorporating it into a broader documentary. *Cf. Lynk Media, LLC v. Peacock TV LLC*, 23-CV-5845 (JGK), 2024 WL 2057235 (S.D.N.Y. May 8, 2024) (no transformative use where NBC took clip of Rudy Giuliani speaking in front of "Four Seasons Landscaping" and used it in documentary about the subsequent effect on the landscaping company).

3. The district court also drew a definition of transformative use that lacked boundaries. It has long been doctrine in this Circuit that "difference in purpose is not quite the same thing as transformation." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998); *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (Leval, J.) ("The word 'transformative' cannot be taken too literally as a sufficient key to understanding the elements of fair use. It is rather a suggestive symbol for a complex thought, and does not mean that any and all changes made to an author's original text will necessarily support a finding of fair use."). That was the core holding in *Warhol*. 598 U.S. at

532 ("[T]he first fair use factor considers whether the use of a copyrighted work has a further purpose or different character, which is *a matter of degree*."); *see also id.* at 529 ( "The larger the difference, the more likely the first factor weighs in favor of fair use. The smaller the difference, the less likely.").

The district court found that Hoiland's presentation had a different purpose from the original, but it failed to consider whether her use of the original was "in service of a fundamentally different and new artistic purpose and character." *Andy Warhol Found. for Visual Arts,* 11 F.4th at 42. It was not. Both used the work for academic purposes. Both used the work to instruct college faculty members to assess their teaching of QR skills. Hoiland had some other objectives as well. *See* JA-405 (disseminating "assessment results" and discussing the "challenges and successes" relating to assessment). But this is hardly a "fundamental" difference. The district court did not even attempt to explain how it was.

4. But the district court made an even more fundamental error. What is missing entirely from its opinion is the issue of *justification*. "An independent justification … is particularly relevant to assessing fair use where an original work and copying use share the same or highly similar

purpose." *Warhol*, 598 U.S. at 532; *see also id*. at 549 (noting "this Court's repeated emphasis on justification"); *Warhol Second Circuit*, 11 F.4th 26, 41 (2d Cir. 2021) ("where a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a higher or different artistic use is insufficient to render a work transformative") (cleaned up); *Grant v. Trump*, 563 F. Supp. 3d 278, 284 (S.D.N.Y. 2021) (same). Neither Hoiland nor the district court gave any reason why she needed to use *Wilder*'s work in her presentation rather than undertake "the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994). That should have been fatal to her claim. The district court paid lip service to the importance of justification in other cases. SPA- 32. But the district court failed to ask the question about *this* case. That in itself requires reversal.

#### ii. The Court mistakenly thought Hoiland's edits to Wilder's work weighed in favor of fair use—when in fact those edits weighed *against* fair use.

1. The Court also erred when it turned its attention to the written presentation. The court found a different purpose and character because

of what Hoiland ostensibly cut out, what Hoiland ostensibly added, and what Hoiland ostensibly edited. None of these support a finding of fair use. In fact, they point the other way.

2. Begin with what Hoiland omitted. The court found it instructive that Hoiland deleted procedural material such as deadlines, instructions for peer review, and the like—material that the attendees of the presentation would not need because they were not enrolled in the NICE curriculum. That misses the point entirely. Scholars in all fields write how-to guides for practitioners. But that does not open their manuals for adaption to a non-practitioner audience. Many a lawyer has written a high court brief, for example, with their trusty copy of *Stern & Gressman* by their side.[8] But the treatise is used by non-practitioners too. *See, e.g.*, *Virginia Military Inst. v. United States*, 508 U.S. 946 (1993) (citing treatise to make a point about procedure on *certiorari*). That would not give a copier the right to leave in the caselaw analysis and strike out the process points. Or imagine a copy of a Second Circuit practice manual that omits instructions about how to properly format PDFs in a joint

[8] R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice (11th ed. 2019).

appendix. *See* CTA2 Rule 32.1(b)(3) (instructing filers to adjust page numbering to correspond with the PDF reader's numerical search field). Excising that would not make the rest of the practice manual free for the taking.

3. Turn next to what Hoiland edited. The court found that Hoiland made some alterations to Wilder's copyrighted materials—drawing out a short parenthetical, altering a few words, tinkering with fonts. SPA-32. But the record evidence shows that *Wilder*, not Hoiland, made those edits. *Supra* at 19. The edits that Hoiland *did* make, on the other hand, are telling. Most importantly, on the eve of the conference she increased the font size of Wilder's Unit 7H so that it could be more easily read by conference attendees, *supra* at 21-22; JA-216-217—thus *literally* "amplifying, rather than minimizing," *Warhol Second Circuit*, 11 F.4th at 47, Wilder's work. If Hoiland meant to use Wilder's text for a "new and different" function, making it an easier read was an unusual way to do so.

4. The Court especially erred when it evaluated the short phrases Hoiland added at the bottom of certain pages. ("Keep it simple: pre/post, three questions, and a scoring rubric"; "Clarity, alignment,

generalizability, validity, and soundness.”). *Supra* at 18-19; JA-74; JA-77. The Court saw these as “her own commentary and takeaways on the course material.” SPA-33. But they were nothing of the kind. They were *plucked from very text that she cribbed*. Take the phrase “clarity, alignment, generalizability, validity, and soundness.” This is just a five-word extract of the pages that preceded it—which asked whether a QR assessment was “clear and straightforward” (in other words, had “clarity”), whether skills “correspond[ed] to the QR learning goals” (enjoyed “alignment” with them, that is), whether the assessment instrument “extend[ed] beyond just being a math skills test” (that is, had “generalizability”), whether the instrument assessment was “valid” (or did it have “validity,” in Hoiland’s rewrite), and whether the instrument was “sound” (Hoiland’s “soundness”).[9] *Supra* at 19. This is no “bona fide abridgment” of Wilder’s original work. *Folsom*, 9 F. Cas. 345. It is “the facile use of the scissors,” *id.*—the oldest form of copyright infringement in the book.

[9] The same is true of Hoiland’s other supposed summary: “Keep it simple: pre/post, three questions, and a scoring rubric.” JA-74. This too was simply harvested word-for-word from Wilder’s copyrighted work. *See* JA-62 (“please keep your assessment instrument simple,” “pre-test/post-test design,” “3 questions,” “scoring rubrics”). *Supra* at 18.

**iii. It does not matter that Wilder would have objected to the use.**

The district court made yet one more error over transformative use. The court found it compelling that Wilder never would have agreed to Hoiland's presentation because it was for "a different audience, context, and purpose than what she had originally intended." SPA-31 (cleaned up). But that has no bearing on transformative use. Authors have every right to reject the use of their works if they do not approve of the context—no matter what the reason. Theodore Geisel's heirs did not endorse the taking of The Cat in the Hat for a schtick about the OJ Simpson trial. ("One knife?/Two knife?/Red knife/Dead wife.") But that did not mean the satire was excused. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) (finding no fair use). *See also Harper & Row*, 471 U.S. 539 at 550 n. 3 (1985) ("Perhaps no more precise guide [for fair use] can be stated than Joseph McDonald's clever paraphrase of the Golden Rule: 'Take not from others to such an extent and in such a manner that you would be resentful if they so took from you" (quoting 3 Nimmer § 13.05[A], at 13–66)). Wilder's disapproval of the manner in which Hoiland' appropriated her work does not cut against her at all.

**iv. The district court wrongly took into account the way Hoiland talked about Wilder, and how the audience responded to her PowerPoint, in her oral presentation.**

The court also erred by failing to distinguish Hoiland's written work from her oral presentation for fair use purposes. Hoiland infringed Wilder's exclusive rights in her work by displaying it without permission during her presentation. *See* 17 U.S.C. § 106(5). But she also *reproduced* Wilder's work, *made a derivative* of Wilder's work, and authorized the *distribution* of Wilder's work to conference attendees—all in the form of her written presentation. Those are separate infringing acts. *See* 17 U.S.C. § 106 (1) (copying), (2) (making derivatives), (3) (distribution); *id.* at preamble (owner has exclusive rights "to do *and to authorize*" any of those enumerated acts) (emphasis added). If Hoiland was to prevail on a fair use defense, she needed to show that *each* of these uses was transformative. But the court intermingled the oral presentation with its discussion of the written presentation indiscriminately, *see* SPA-31-32—making it clear that if Hoiland could show that merely the *display* was transformative, she would be home free on all the other uses as well. That was error.

In reaching this conclusion, the district court once again ran afoul of *Warhol*. There, the late pop artist infringed the photographer's exclusive rights in three ways: by reproducing it within his derivative silkscreens, by distributing copies of many of those derivatives to museums and collectors, and by licensing one of those derivatives to Vanity Fair. But the photographer challenged only the commercial licensing to Vanity Fair—not the other two uses. "*We limit our analysis accordingly*," the Court noted. 598 U.S. at 534 (emphasis added). Why? Because whatever difference there may be between the photograph and the silkscreen, "that difference must be evaluated in the context of the specific use at issue." *Id*. at 545.

*Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003), brings the error even more into focus. A production company made a 16-hour documentary about the King. But it used video footage without a license. Did it make a transformative use? The Ninth Circuit said, in effect: "it depends." Some of the uses were transformative "because the clips play[ed] for only a few seconds and [were] used for reference purposes while a narrator talk[ed] over them or interviewees explain[ed] their context." *Id.* at 628. But for others the production

company "crosse[d] the line"—"by making more than mere references to these events and instead show[ing] significant portions of these copyrighted materials." *Id*. at 629. One might note the distinct similarities between that case and ours. Hoiland displayed Wilder's work. She also distributed it in written form. Assume what one will about the former. The latter definitively "crosse[d] the line." The context matters.

2. The district court not only failed to consider Hoiland's display in isolation from her other forms of infringement—it also analyzed the *display* incorrectly. In the court's telling, the words on the pages came alive. The slides were merely visual aids for her overall presentation. SPA-30. There was "a much larger story" she was narrating. *Id*. And the audience members asked questions "almost wholly unrelated to the slides themselves" during a lengthy question-and-answer session during the presentation. *Id*. We have only Hoiland's version of what happened at the conference. But let us take it as true. It simply does not matter.

It does not matter because for one thing, Hoiland knew—*anyone* in her situation would have known—that the text on the slides was meant to be read during the presentation. Hoiland dedicated 45 minutes of her

75-minute presentation to going through the slides ("one after the other" in her words, JA-269) in her 23-page PowerPoint—an average of two minutes per page. *Supra* at 23; JA-167-18; JA-210. Wilder's work made up five pages of her slides—the only pages that matched her primary goal of sharing "best practices in faculty development related to assessment." *Supra* at 9-10; JA-65; JA-405. So Hoiland would likely have dwelt on them more than others. In fact she showed the pages specifically so that attendees could see "the types of questions [program participants] were asked to answer in preparing their assessment materials." Supra at 23; JA-268.

Hoiland also deliberately enlarged the text of Wilder's work in order to enable it to be more easily read, *supra* at 21-22; JA-216-217; JA-73-77, and she extracted certain words and phrases from Wilder's work to highlight them even further in a distillation at the bottom of two pages, *supra* at 17-18; JA-190; JA-199—all to provide "specific advice" to conference attendees regarding "creation of the assessment instrument." JA-267. She must have intended—any reasonable person in her position

would have intended—for audience members to read the text.[10] At a minimum, based on the substantial record evidence on point, a reasonable jury *could* have found that she so intended. Summary judgment in Hoiland's favor was therefore not warranted.

It also does not matter because even in Hoiland's own telling, she did nothing to *comment* on Wilder's work. Hoiland has testified—and the court found—that she repeatedly referenced Wilder and her leadership role in the NICHE Project and the NICE Project. JA-265; SPA-8. But for all of this evidence, there is the proverbial dog that does not bark. At no point in the record is there the slightest evidence that Hoiland actually *commented on Wilder's work itself*. She may well have acknowledged Wilder's role in the project. She may well have spoken highly of Wilder. But there is no evidence she offered any criticism, commentary, or analysis of the very work that she copied. That dooms her claim of transformative use.

---

[10] And contrary to the district court's opinion, it is irrelevant that the audience asked questions about other subjects. Hoiland's purpose, not the audience's, is what matters. *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) ("However, it is Kirkwood's own retransmission of the broadcasts, *not the acts of his end-users*, that is at issue here and all Kirkwood does is sell access to unaltered radio broadcasts.") (emphasis added).

There is one more reason why the display could not qualify as a transformative use: Hoiland has articulated no justification *whatsoever* for pasting Wilder's work into her presentation. Wilder and Hoiland have jointly presented *about* the NICHE/NICE program at two national organizations—but not once did either share the full text of the NICHE/NICE training *materials*. *Supra* at 8; JA-53. Hoiland has articulated no reason why she needed to do so now. In both the oral and written forms of her presentation, the purloining of Wilder's work was unnecessary—and therefore not transformative.

#### 2. Hoiland's non-commercial educational purpose does not outweigh the non-transformative nature of her copying.

The fact that Hoiland used Wilder's work for a non-commercial, academic purpose does not outweigh the non-transformative nature of her use. Hoiland did not gain a monetary benefit from her presentation. But "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain *but whether the user stands to profit* from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562 (emphasis added); *see also Campbell*, 510 U.S. at 584. ("The mere fact that a use is educational

and not for profit does not insulate it from a finding of infringement."); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (Souter, J., on panel) ("removing money from the equation does not, under copyright law, remove liability for transgressing another's works").[11] Hoiland profited handsomely from her use of the work in this case.

Hoiland profited from Wilder's work for a simple reason: she advanced her career by using it in her presentation. As the district court properly recognized, "publication in the academic setting is a special context in which non-monetary rewards are perhaps more valuable than financial earnings." SPA 41. Hoiland earned exactly those non-monetary rewards—both by publishing her PowerPoint to 237 attendees at a conference of specialists in her field and by displaying it to an animated and inquisitive subset of those specialists in an oral presentation. *Supra*

[11] *See also Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 13–14 (S.D.N.Y. 1992) (Level, J.) *aff'd*, 60 F.3d 913 (2d Cir. 1994) ("Scholarly and scientific writing has no readership except among those who use it in scholarly and productive or educational undertakings. If that fact alone were sufficient to justify the making of superseding copies, the authors and publishers of scholarly, scientific and educational materials could not protect their copyrights and could not survive as against inexpensive copier technology.")

at 23 and 24; JA-165; JA-172; JA-238; JA-492. She also wasted no time in listing her presentation at the conference on her CV. JA-251. That type of benefit, coupled with Hoiland's decidedly non-transformative use of Wilder's work, assures that the first factor remains in Wilder's favor.

*Weissmann v. Freeman* is the leading case for this proposition. There, a professor at a medical school purloined a colleague's syllabus, deleted the author's name, and prepared it for use in teaching his own class. The district court concluded that because Dr. Freeman received only a $250 honorarium and did not "stand to profit," the first factor cut in his favor. 868 F.2d at 1324. This Court disagreed. When it comes to the purpose and character of the use, the Court found, monetary gain was not the sole criterion:

> Dr. Freeman stood to gain recognition among his peers in the profession and authorship credit with his attempted use of Weissmann's article; *he did so without paying the usual price that accompanies scientific research and writing, that is to say, by the sweat of his brow*. Particularly in an academic setting, profit is ill-measured in dollars. Instead, what is valuable is recognition because it so often influences professional advancement and academic tenure. *The absence of a dollars and cents profit does not inevitably lead to a finding of fair use.*

*Id*. at 1324 (emphasis added).

*Weissmann* remains the rule in this Circuit—and it is now the rule in other circuits as well. For example, in *Soc'y of Holy Transfiguration Monastery,* an archbishop and former member of a monastery posted on his website portions of the monastery's translations of ancient Greek religious texts. The court found that the first factor weighed against fair use. *Id*. at 61 (the archbishop "benefitted by being able to provide, free of cost, the core text of the Works to members of the Orthodox faith, and by standing to gain at least some recognition within the Orthodox religious community [as a result]"). *See also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117 (9th Cir. 2000) ("in weighing whether the purpose was for profit, monetary gain is not the sole criterion, particularly in a setting where profit is ill-measured in dollars.") (cleaned up); *cf. Cambridge*, 769 F.3d at 1266 (first factor weighs against fair use where academic gains "[a] measurable, indirect benefit by distributing Plaintiffs' works to students, such as a valuable authorship credit").

### B. The Amount and Substantiality of the Portion Used Tilts Heavily in Wilder's Favor.

The district court correctly found that the third factor, the amount and substantiality of Hoiland's infringement of Unit 7H, tilted in Wilder's

favor. SPA-40. But it underplayed just how much. As the court properly noted, Hoiland used about two-thirds of the text in Wilder's deposit copy. SPA-39. The one-third remaining, the court noted, consisted of Wilder's "step-by-step instructions for the faculty participants [in the NICHE program], including deadlines, submission instructions, and discussion of peer feedback." SPA-39. To the court, these omitted instructions were the "heart" of Wilder's work—thus lending the third factor only "slight[]" support for Wilder. SPA-39-40. This was error.

The nature of the court's error follows naturally from one of its fundamental errors in the transformative use section of its opinion—its misapprehension of the central purpose of the two works. *Supra* at 43-48; Wilder's work was intended to teach NICHE participants how to create a personalized QR learning assessment. *Supra* at 5-6. That is a substantive exercise, not an administrative one. Deadlines and "submission instruction[s]" are no more the heart of Wilder's work than ECF filing instructions would be the heart of a Second Circuit practice manual. *See supra* at 49-50. This factor weighed for Wilder—but much more than the district court believed.

### C. The Effect on the Market—Or in This Case, the Effect on Wilder's Academic Reputation and Publishing Opportunities—Also Weighs Against Fair Use.

1. The district court wrongly found that the fourth factor, effect on the market, tilted against Wilder. The court correctly acknowledged that in the academic context, the proper question was not whether Wilder lost commercial opportunities but rather whether there was "any detriment to Wilder's own publications, promotions, or incentives to continue her scholarly research." SPA-41. But the court concluded that factor four still tilted in favor of fair use because Wilder had "alleged no harm to that potential market other than speculation." SPA-44. That was error.

2. The district court got this factor wrong because, under the unique setting of this case, Wilder had *no duty* to show harm to the potential market. At least two circuits—including this one—have made that clear. The seminal decision in this Circuit, as with the first factor analysis, is *Weissmann*. There, as noted above, one professor took another's course syllabus and distributed it for use in his own class. The district court, finding that the professor's conduct "[did] not impair its market value at all," concluded that the fourth factor weighed in favor of fair use. *Weissmann v. Freeman*, 684 F. Supp. 1248, 1262 (S.D.N.Y. 1988). This

Court reversed, finding that the district court erred in "focusing on sales or dollars received, rather than upon the realities of promotion and tenure in an academic setting." 868 F.2d at 1325. Notably, though, this Court did not remand for further findings. It did not even cite any facts in the record itself. Under the facts of *Weissmann*—which is for all intents and purposes indistinguishable from *this* case—the fourth factor did not change the outcome.[12]

The district court misread caselaw to conclude otherwise. In its order rejecting Wilder's motion to alter or amend the judgment, the court cited *Authors Guild* for the proposition that summary judgment was appropriate in favor of Hoiland on the basis of "essentially unrebutted" evidence showing that the claim of market harm was speculative. SPA-51. But Judge Leval, writing for this Court in that case, had already

[12] In *Weissmann*, notably, the purloined work in that case was never meaningfully distributed. The professor made 50 copies and passed out nine of them to employees. 868 F.2d at 1316 (50 copies); 684 F. Supp. 1250 (given to nine employees). When the professor was called onto the carpet, he pulled the work from his lecture packet, halted circulation to his students, and fessed up to the nine employees. 868 F.2d at 1316. But the aborted distribution and the post-hoc effort to cure did not save him. He reproduced his mentee's work and made a derivative of it. Even with this minimal distribution, the *Weissmann* court found, the fourth factor weighed against fair use.

concluded that the challenged use—the creation of a full-text searchable database—was "a quintessentially transformative use." 755 F.3d at 97. So that case is not remotely on point. The same is true of *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986), the district court's other authority. *See* 803 F.2d at 1260 (challenged work employed the purloined work for purposes of criticism and comment). The two cases bolster, not weaken, the rule Wilder advances here.

*Weissmann* brought this Circuit into line with caselaw in the Ninth Circuit. In *Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983), a teacher purloined another teacher's booklet about cake decoration and used it in her adult education classes. The district court held that this was fair use, but the court of appeals reversed. The court of appeals found that the first and third factors weighed against fair use and that the second factor was neutral. 695 F.2d at 1175-1177. As to the fourth factor, the court found, it simply did not matter. The district court had found no evidence that the copying had any effect on the market for the plaintiff's booklet, and the court of appeals accepted the finding. But that did not change the outcome. "Even assuming that the trial court's finding was not erroneous, and that that finding must be accepted and weighed in

Rowley's favor, it does not alter our conclusion." *Id.* at 1177. "Under these circumstances, neither the fact that the defendant used the plaintiff's booklet for nonprofit educational purposes nor the fact that plaintiff suffered no pecuniary damage as a result of [the] copying supports a finding of fair use." *Id.* at 1179.[13]

4. But even if the district court was right that Wilder needed to show market harm, it still erred on another ground: Wilder *did* show evidence of market harm. The district court committed multiple errors in concluding otherwise.

For one thing, the court wrongly dismissed Wilder's claims that Hoiland's use could hinder her plans to "commercialize the NICHE

[13] *Weissmann* and *Marcus* are consistent with bedrock fair use doctrine. Judge Leval's seminal article on transformative use, written two years after *Weissmann*, says the following: "[I]f the taking is unjustified under the first factor, it should be considered an infringement, *regardless of the absence of market impairment*." Leval at 1124 n.84 (emphasis added). That is even more true in wake of *Campbell* than it was at the time of this article. "Prior to *Campbell*, the Supreme Court had characterized the fourth factor as "the single most important element of fair use. However, *Campbell*'s discussion of the fourth factor conspicuously omits this phrasing. Apparently abandoning the idea that any factor enjoys primacy, *Campbell* instructs that all four factors are to be explored, and the results weighed together, in light of the purposes of copyright." *Am. Geophysical Union*, 60 F.3d at 926. *Weissmann* and *Marcus* are even more controlling now than ever.

materials" in a textbook. SPA-41. The court found that Wilder encountered a "roadblock" with this argument because the Unit 7H text she authored was only a small portion of the NICHE materials. Thus, "to the extent that Wilder intends to publish the entire NICHE/NICE curriculum together as a textbook … she would first have to hold a valid copyright in each of the units." SPA-41-42. But this overlooks the very basic concept of *licensing*. Wilder need not own a copyright in every unit of the NICHE materials in order to publish the work—she need only obtain a license to those she did not own (or alternatively, license out the portion she did own to another scholar in exchange for a share of royalties). The district court simply got this wrong.

And there is another avenue that Wilder could have exploited if not for Hoiland's infringement: *the very type of conference that Hoiland attended*. Suppose the district court is right (though it is not) that Wilder could not have published Unit 7H as part of a textbook. Even if there is only one market option for a copyrighted work, the fact that a defendant avails herself *of that very option* causes market harm that qualifies under the fourth factor. For example, in *Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554 (D.D.C. 1981), a student wrote an article for the

Harvard Law Review. The Legal Times, a trade journal, reprinted the article in full. The district court found the fourth factor weighed against fair use. "The reprinting eliminated the possibility that plaintiff could sell his article to a legal newspaper such as the Legal Times, and for all practical purposes those newspapers *represented the entire market f*or his article." 506 F. Supp. at 560 (emphasis added); *see also Aitken, Hazen, Hoffman, Miller, P. C. v. Empire Const. Co.*, 542 F. Supp. 252, 260 (D. Neb. 1982) ("[B]y copying the plaintiff's plans and using them for the same functional purpose as that which the plaintiff's plans would have been used for had [the defendant] not copied the plans, [the defendant] destroyed the plaintiff's potential market."). These cases are directly on point. If it is true that Wilder had no publishing outlets in journals or a treatise—and it is not—then she *at least* would have had the ability to publish Unit 7H at academic conferences. But Hoiland availed herself of this market as well. The use was not remotely fair.

The court made one final error in analyzing the fourth factor. The court found that there was no record evidence that the PowerPoint was "actually downloaded or viewed" by attendees or that it was "disseminated outside the conference attendees." SPA-43 But there *was*

such evidence. Hoiland purported to grant the conference organizers a license to copy and distribute the PowerPoint, JA-165, and she specifically acknowledged that the conference organizers would be posting the document online "*for downloading*"—via website and mobile application, no less—by conference participants. JA-165 (emphasis added). *See generally supra* at 20. A reasonable jury could easily have found that the work was, in fact, distributed—and distributed substantially. Summary judgment for Hoiland was wrong for this reason as well.

## II. THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF FAIR USE.

The Court should not merely reverse the grant of summary judgment to Hoiland. It should also *grant* summary judgment in favor of Wilder on the fair use defense. "Where the district court has found facts sufficient to evaluate each of the statutory factors, an appellate court "need not remand for further factfinding, but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work." *Harper & Row*, 471 U.S. at 560. This case merits just such treatment. The Court must give Hoiland all reasonable inferences

in considering Wilder's summary judgment motion. But there are only two facts reasonably in dispute at this point in the case—and neither should affect the outcome.

The first fact in dispute is whether Hoiland actually intended, based on all the evidence, to have faculty attendees read the words of Unit 7H. The evidence is overwhelming that she did. She made it the centerpiece of her presentation; she edited the text to draw out what she considered to be the key points; she blew up the text size specifically so it could be read, and she *admittedly* used it to show attendees "the types of questions faculty participants were asked to answer in preparing their assessment materials." JA-267 (capitalizations removed); *see generally supra* at 23. No reasonable jury could find otherwise. But even if there is a material dispute on this issue—and there is not—it would not change the outcome. Hoiland's display of the PowerPoint was only one element in her infringement of Wilder's work. She also copied it, made a derivative of it, and authorized the distribution of it. *Supra* at 10-21. Hoiland must prove *all* of these uses were fair. She cannot do so under any view of the evidence.

The second fact in dispute is whether the PowerPoint was actually distributed in written form to conference attendees. Once again, there should be no material dispute on this. Hoiland authorized the conference organizers to distribute the work and the conference attendees, following this authorization put it online for attendees to download it on their laptops or mobile apps. *Supra* at 20. No reasonable jury could find they did not. But again—this does not change the outcome. Binding authority in this Circuit make clear that in a case like this, a plaintiff does not need the fourth factor to prevail. *Supra* at 63-69. Wilder should win under either set of facts.

## III. THE DISTRICT COURT ERRED IN DENYING WILDER'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF OWNERSHIP.

The district court should also have granted Wilder's motion for summary judgment on her claim of ownership. The claim was straightforward. Under the Copyright Act, ownership of the copyright in any work vests initially in the author. 17 U.S.C. § 201(a). Thus, in order to prove ownership of work, a plaintiff needs only to show that she wrote that work. The burden then turns to the defendant to show otherwise. For example, the defendant might present evidence that the plaintiff

transferred the copyright to a third party after authoring the work. Alternatively, and more relevant to this case, the defendant might present evidence that the plaintiff authored the work as a "work for hire" on behalf of an employer. Importantly, "the party relying on the work-for-hire exception bears the burden of demonstrating that it applies." *Horror Inc. v. Miller*, 15 F.4th 232, 242 (2d Cir. 2021). That is because work for hire is an *affirmative* defense. *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 314 (S.D.N.Y. 2000); *Foster v. Lee*, 93 F. Supp. 3d 223, 229 (S.D.N.Y. 2015). To meet her burden of proving ownership, all a plaintiff needs to do is to establish authorship—period.

The district court confused the burden of proof in this case. The court found that although the National Science Foundation "normally" allows grantees to retain the rights to intellectual property generated under their grants, Wilder had not shown that this policy was specifically in effect for the NICHE grant. SPA-24. Moreover, the court reasoned, the grantee in this case was technically CUNY and not Wilder—and Wilder had not explained "by what path copyright ownership would pass, under this scenario, from []CUNY as the NSF grantee to her as the 'author' of the work." SPA-25. But copyright ownership did not have to "pass" from

the NSF or CUNY to Wilder—nor from anyone. She presumptively owned the copyright as soon as she authored the work. If Hoiland thought otherwise, it was her burden to prove it.

The district's court's rule would lead to boundless mischief. The author of a work could theoretically transfer her rights to any number of people—colleagues, collaborators, exclusive licensees, publishers, family members, to name just a few. By the district court's logic, Wilder would have to *disprove* every one of these to show ownership. The same is true for the work-for-hire doctrine. By the court's logic, any copyright plaintiff who has an employer would have to *disprove* that the employer owns the work.[14] That would make litigating copyright an impossible task. It is not the law.

The court erred in one final way. Because work for hire is an affirmative defense, it is also a *waivable* defense. And Hoiland has done just that here by failing to raise the defense in her answer. "Failure to plead an affirmative defense in the answer results in the waiver of that

[14] Or for that matter, any independent contractor who created a work within the enumerated factors of 17 U.S.C. § 101. *See id.*, work for hire definition (setting out the types of types of works that can become works for hire pursuant to written agreement with an independent contractor).

defense and its exclusion from the case." *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (cleaned up). She did not even raise a work-for-hire defense in her summary judgment motion. She has not preserved the argument. Ownership should no longer be contested.

## CONCLUSION

The Court should reverse the grant of summary judgment to Hoiland on her affirmative defense of fair use, reverse the denial of summary judgment to Wilder on Hoiland's affirmative defense of fair use, and reverse the denial of summary judgment to Wilder on her claim of ownership.

/s/ *Matthew Hersh*
Matthew Hersh
MESTAZ LAW
5090 N. 40th Street
Suite 200
Phoenix, AZ 85018
Telephone: (602) 806-2068

*Counsel for Appellant-Cross-Appellee*
*Esther Wilder*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned hereby certifies that this brief complies with the type-volume limitation.

1. This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because this brief contains 13785 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a plain, roman-style typeface using 14-point Century Schoolbook.

/s/ *Matthew Hersh*
Counsel for Appellant-Cross-Appellee
Esther Wilder

# SPECIAL APPENDIX

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

| | Page |
|---|---|
| February 1, 2024 Order granting Hoiland's Summary Judgment Motion and denying Wilder's Summary Judgment Motion | SPA-1 |
| February 2, 2024 Judgment | SPA-46 |
| April 24, 2024 Order Denying Wilder's Motion to Alter or Amend Judgment and denying Hoiland's Motion for Attorney Fees | SPA-47 |
| Text of 17 U.S.C. ¶ 106 | SPA-57 |
| Text of 17 U.S.C.A ¶ 201 | SPA-58 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ESTHER WILDER,

Plaintiff,

-against-

SARAH HOILAND,

Defendant.
-----------------------------------------------------------x

OPINION AND ORDER

22-cv-1254 (PKC)

CASTEL, U.S.D.J.

Plaintiff Esther Wilder, a faculty member at Lehman College of the City University of New York ("CUNY"), alleges that defendant Sarah Hoiland, a faculty member at CUNY's Hostos Community College, infringed her copyright during a presentation Hoiland made at an academic conference in February 2019. After the 2019 presentation, Wilder filed for and obtained a copyright registration on the material that she had originated in 2013. Wilder's claim of copyright infringement relates to Hoiland's one-time use of Wilder's material on 5 of 23 PowerPoint slides at a "breakout" session attended by 12 to 20 individuals who were participating in a larger conference of community college professors and administrators.

The parties have cross-moved for summary judgment. The Court principally concludes that on the summary judgment record, no reasonable factfinder could find that the affirmative defense of fair use had not been established by Hoiland. Accordingly, the Court will grant summary judgment in favor of Hoiland.

Background

Wilder moves for summary judgment in her favor on copyright infringement. Hoiland cross-moves for summary judgment dismissing Wilder's claim, arguing that Wilder is not the owner of a valid copyright and that Hoiland's use was authorized either under an implied license or as fair use. For each side's motion for summary judgment, the Court construes the facts in a light most favorable to the non-movant. Many of the core facts are undisputed and the Court notes material disputes where they exist.[1]

Dr. Wilder is a tenured professor of sociology at CUNY's Lehman College, a four-year college located in the Bronx. (Pl. 56.1 ¶ 1 (ECF 35); Def. 56.1 Resp. ¶ 1 (ECF 78).) Dr. Hoiland is an associate professor of sociology at CUNY's Hostos Community College, a two-year community college also located in the Bronx. (Def. 56.1 ¶ 1 (ECF 77); Pl. 56.1 Resp. ¶ 1 (ECF 79).) The evolution of their working relationship and the relevant projects involved are outlined below.

1. NICHE (2011-2016)

From 2011 to 2016, Wilder served as "Principal Investigator" ("PI") for a faculty development program entitled NICHE ("Numeracy Infusion Course for Higher Education"), which was funded by a National Science Foundation ("NSF") grant. (Pl. 56.1 ¶¶ 3-5; Def. 56.1 Resp. ¶¶ 3-5; Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.) The program was intended to help "teach faculty at CUNY best practices for infusing quantitative reasoning ['QR'] into their courses, and the assessment of that instruction." (Pl. 56.1 ¶ 4; Def. 56.1 Resp. ¶ 4.) The parties agree that Wilder "developed and created most of the instructional materials and guidelines used in NICHE." (Pl.

[1] Citations to the parties' Rule 56.1 statements are intended to reflect the evidence cited in those statements.

56.1 ¶ 7; Def. 56.1 Resp. ¶ 7.) Wilder also asserts that she "authored the original instructional material for a key component of NICHE, Unit 7 (Unit 7H) on QR assessment." (Pl. 56.1 ¶ 9.) Unit 7H was first published as part of NICHE in 2013; Wilder did not, however, apply for a certificate of registration from the U.S. Copyright Office at that time. (ECF 1-4; Pl. 56.1 ¶¶ 9, 13; Def. 56.1 Resp. ¶¶ 9, 13.) Hoiland does not claim to have authored the NICHE materials. (Def. 56.1 ¶ 11; Pl 56.1 Resp. ¶ 11.) In fact, both parties agree that Hoiland was not involved at all with NICHE. (Pl. 56.1 ¶ 21; Def. 56.1 Resp. ¶ 21.) NICHE is not to be confused with NICE, a project discussed below that came into existence in 2016 and in which both Wilder and Hoiland were involved.

The NICHE course materials consisted of eight sub-units focusing on different areas. Unit 7H—the sub-unit at issue here—focused on helping educators develop an "assessment plan and instruction" for measuring "learning goals," i.e., measuring success in infusing numeracy and QR into their classrooms. (Pl. 56.1 ¶ 10; Def 56.1 Resp. ¶ 10.)

2. <u>NICE (2016-2019)</u>

In 2016, Wilder became interested in an "extension" of her NSF NICHE grant to a new program designed to train faculty in QR literacy at three "Hispanic Serving Institutions (HSIs)" in the Bronx. (Pl. 56.1 ¶¶ 17, 18; Def. 56.1 ¶ 14.) Hostos Community College has been designated as an HSI. (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.) This new project was entitled "Numeracy Infusion for College Educators" ("NICE"). (Pl. 56.1 ¶ 15; Def. 56.1 Resp. ¶ 15.) Although there is some dispute as to when their working relationship officially began, Wilder eventually contacted Hoiland about serving as a PI on NICE. (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15; Pl. 56.1 ¶ 19.) Hoiland accepted the offer, and she and Wilder became co-PIs on the NICE project. (Pl. 56.1 ¶ 22; Def. 56.1 Resp. ¶ 22.) Due to the structures involved in an NSF

proposal, both Wilder and Hoiland submitted grant proposals to the NSF for funding for NICE as co-PIs for their respective campuses. (Def. 56.1 ¶¶ 17-18, 21-22; Pl. 56.1 Resp. ¶¶ 17-18, 21-22.) The proposal was successful, and the NICE program received funding from the NSF in 2017. (Pl. 56.1 ¶ 36; Def. 56.1 Resp. ¶ 36.)

The parties agree that "[b]oth NICHE and NICE involved instructional materials created for the NICHE project." (Pl. 56.1 ¶ 30; Def. 56.1 Resp. ¶ 30; Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.) Although a goal of NICE was to "adapt" the NICHE materials for the new program, the parties agree that "the adaptation did not happen and the NICHE instructional materials were instead essentially incorporated whole into NICE unchanged other than the references changed from NICHE to NICE." (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29; Pl. 56.1 ¶ 46; Def. 56.1 Resp. ¶ 46.) The NICE program ran from January 2017 to December 2019, with several "cohorts" of CUNY faculty completing the course. (Pl. 56.1 ¶¶ 36-37; Def. 56.1 Resp. ¶¶ 36-37; Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 43.)

Hoiland also "enrolled" in the NICHE course once she joined the NICE project. (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.) The parties dispute the purpose of Wilder enrolling Hoiland in NICHE, but they agree that Hoiland did review the original NICHE materials at that time. (Pl. 56.1 ¶¶ 38-39; Def. 56.1 Resp. ¶¶ 38-39.) During the first year of NICE, Wilder also asked Hoiland to complete the NICE program as a "faculty participant"—i.e., as a student in the program—while also serving as the program's PI. (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)

Prior to February 2019, Wilder and Hoiland gave two presentations together about NICE at professional conferences. (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49; see also ECF 37-1.) Hoiland also gave a presentation about NICE with another colleague in which they "presented

the instructional and assessment materials they created as participants in NICE." (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51.)

3. The CCCLA Presentation (2018-2019)

In June 2018, Hoiland submitted a proposal for a presentation she wished to make at the Community College Conference on Learning Assessment (the "CCCLA") at Valencia College in Orlando, Florida. (Def. 56.1 ¶ 62; Pl. 56.1 Resp. ¶ 62.) In July 2018, Hoiland learned via email that Valencia had accepted her proposal; the conference was scheduled to take place in February 2019. (Def. 56.1 ¶ 68; Pl. 56.1 Resp. ¶ 68.)

On July 27, 2018, Hoiland forwarded the acceptance email she received from Valencia to Wilder and wrote, "I submitted a proposal to this conference and it was accepted. It's in Orlando in February. . . . Do you have any interest in co-presenting?" (ECF 46-8 at 2.) The email listed the title of the presentation as "Assessing Numeracy in a Faculty Development Program." (Id.) Hoiland's email to Wilder did not attach any slides or other excerpts of her planned presentation. The email did, however, forward a copy of an intellectual property license included by Valencia in its acceptance email for Hoiland to complete. (Id.)[2] As part of her proposal to CCCLA, Hoiland wrote in her abstract, "The presenter is one of two principal investigators of a National Science Foundation (NSF) faculty development program titled Numeracy Infusion for College Educators (NICE)." (ECF 46-7 at 2.) Hoiland also wrote in the abstract that "we will discuss both the challenges and successes we have encountered" and that "we see our faculty development program as a way to infuse numeracy. . . ." (Id. (emphasis added).)

[2] This license read as follows: "I am responsible for obtaining the written consent of the owner of the copyrighted material (if I am not the owner) . . . . I warrant that the materials for which I am providing a license do not violate the copyright, trade secret, trademark or other intellectual or proprietary rights of any third party or any applicable law . . . ." (ECF 46-13 at 2.) Hoiland executed this agreement on October 17, 2018. (Id.)

Upon receiving Hoiland's email, Wilder responded that she was not able to co-present, but the parties dispute whether Wilder had other commitments or whether she was not interested in presenting at a community college conference. Hoiland asserts that Wilder responded that she was happy Hoiland was going to be presenting. (Pl. 56.1 ¶¶ 63; Def. 56.1 Resp. ¶¶ 63.) There is no email in the record reflecting Wilder's response, however, although Hoiland referred to it in later correspondence with Wilder. (ECF 52 at 5 ("I asked you if you wanted to co-present and you said no, but you appreciate me asking you and that 'it's great that you're presenting' (email 7/27/18)."))

In February 2019, Hoiland gave her presentation at CCCLA. (Def. 56.1 ¶¶ 74-75; Pl. 56.1 Resp. ¶¶ 74-75.) Hoiland asserts that the total number of attendees at this presentation was between 12 and 20 people. (Def. 56.1 ¶¶ 78, 112; ECF 37-5, Tr. 119:2-11; ECF 76 ¶ 84.) Wilder attacks Hoiland's recollection of the event and notes that over 200 people attended the CCCLA itself, although she offers no evidence as to the number of attendees who were present for the "breakout" session at which Hoiland made a presentation. (Pl. 56.1 Resp. ¶¶ 111-12, 114.)

As part of her presentation, Hoiland displayed a PowerPoint slide deck (the "Presentation"). (ECF 1-5; ECF 41-9.) The first slide in the Presentation bears the title, "Assessing Numeracy in a Faculty Development Program." Underneath that, this first slide reads, "Sarah L. Hoiland, Ph.D. Assistant Professor of Sociology, City University of New York, Hostos Community College." (Id. at 2.) No other names or copyright credits are listed anywhere else in the Presentation. The Presentation was also made available by CCCLA for attendees to download. (ECF 36-13 at 4.)[3]

[3] By September 2019, however, the Presentation was no longer available online for attendees to download, according to Valencia. (Id.)

The Presentation consisted of 23 slides. The parties do not dispute that five of these slides contained "portions of the actual text" of Unit 7H. (Def. 56.1 ¶¶ 91, 93; Pl. 56.1 Resp. ¶¶ 91, 93; see also Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69 (Hoiland "admits that she included text directly from Subunit 7H of the Course Materials in Slides 9 through 13 of the CCCLA Slides").) The Complaint attaches an exhibit comparing the text on each of these slides to the copyrighted Unit 7H Text. (ECF 1-6.) The other slides consisted of photos of Wilder, Hoiland, and their various faculty cohorts, as well as other slides discussing the program and its results, though it did not contain any other uses of or quotations from the other NICHE/NICE subunits themselves. (ECF 1-5.)

On slides 14 to 19, Hoiland also included materials created by one of the NICE faculty participants, Dr. Crystal Rodriguez, to "showcase a faculty participant's instructional materials" created in the course of the program.[4] (ECF 37-5, Tr. 196:12-18; see also ECF 1-5 at 15-20.) Hoiland stated that she wanted to showcase someone else's work rather than her own and that she gave Rodriguez full oral credit during the Presentation, including naming her institution, department, and the course she taught. (ECF 36-14 at 2.)

[4] As the record shows, Wilder eventually became aware that Hoiland's Presentation featured Rodriguez's assessment materials, and in September 2019, Wilder made Rodriguez aware of this and requested that Valencia add Rodriguez as a co-author of the Presentation as well. (ECF 36-13 at 2-6.) Rodriguez had signed an "IRB form" as a NICE participant, checking "Yes" on a consent form that read, "I would like my identity to be used on the NICE web site for any specific materials (e.g., . . . assignments, assessment instruments . . .) I produce as a result of my involvement in the NICE project." (ECF 36-7 at 4.) Hoiland eventually responded by asking Rodriguez to meet in February 2020; Rodriguez first appeared willing to meet, then responded with an email, more formal in tone, accusing her of a "lack of professional courtesy" and a "lack of professionalism and dishonesty." (ECF 36-14 at 3-6.) Hoiland acknowledged to Rodriguez that she should have asked permission to "showcase" her materials during the Presentation. (Id. at 2.) She also noted that she had "expressed concern last summer when I learned [Wilder] contacted you without telling me and concern with you being added as a co-author; however, I was advised to let it go and not to contact you directly." (Id.) Rodriguez then forwarded Hoiland's response to Wilder. (Id.) Rodriguez, however, is not a party to this action, and Wilder, of course, does not have standing to bring a copyright infringement claim as to Rodriguez's work. The role of Rodriguez's work in Hoiland's Presentation is thus discussed only insofar as it is relevant in this case, including any issue of intent.

Hoiland asserts that, as she showed these slides as a "fleeting visual aid" or a "quick visual," she gave her oral presentation about the NICHE and NICE programs and then answered many questions from the participants—for about half an hour—that were "almost wholly unrelated to the slides themselves." (ECF 75 at 3; ECF 37-5, Tr. 137:2-138:3; id., Tr. 201:8-9; Def. 56.1 ¶¶ 82-83; Pl. 56.1 Resp. ¶¶ 82-83.) While she concedes that Wilder's name did not appear on the slides, Hoiland testified at deposition that she "did more than discuss" Wilder and her role during her presentation: "Dr. Wilder's name came up many, many, many times during the presentation. In fact, when I left the presentation I thought that if she was there, she would be embarrassed at how much I spoke about her." (ECF 37-5, Tr. 115:3-8.) Hoiland also pointed Wilder out in photos on the slides and explained the differences between NICHE and NICE. (Id., Tr. 115:8-15.) She testified that her Presentation included links to the NICHE/NICE website, which had "Dr. Wilder's name all over it," and that she clicked on the link and opened the page to show the audience during the Presentation. (Id., Tr. 92:3-21.)[5]

Hoiland emphasized that "significant time and attention [was] given to Dr. Wilder throughout my oral part of the presentation," but admitted that she did not recall whether she specifically identified Wilder as the "author" of the materials, although she "likely said something that [sic] she created the materials with a team of people that were part of a project called NICHE." (Id., Tr. 115:13-116:6.) She also testified that she gave Wilder "credit for the NICHE project, which is where those materials came from," but that for her to say during the presentation that "Dr. Wilder authored the NICHE materials" would have been "ridiculous,"

[5] The Presentation does appear to contain several blue hyperlinks, but the versions posted to ECF do not contain "live" hyperlinks that would allow the Court to view any websites to which they were linked. (See ECF 1-5 at 9; ECF 41-9 at 9; ECF 46-9 at 9.)

explaining, "[T]hat's not something that I would have said. Because there was a much larger story that I was telling. The slides were not the focus of the presentation." (Id., Tr. 136:7-20.)

On August 2, 2019, Hoiland emailed Wilder asking for "comments or suggestions" on a presentation that she was planning to submit for another conference that fall. (ECF 52 at 7.) While the attachment Hoiland sent to Wilder in this email was not produced, the parties do not dispute that the attachment was the CCCLA PowerPoint, i.e., the Presentation. (Def. 56.1 ¶ 115; Pl. 56.1 Resp. ¶ 115.) Wilder asserts that it was at this point that she first learned of Hoiland's allegedly infringing use of the Unit 7H Text in the Presentation. While Wilder's initial reply on August 2 and Hoiland's response on August 5 regarding her own research ideas were collegial in tone, the correspondence soon escalated into a dispute.

On August 6, Wilder responded to the chain with a request that Hoiland "cite" any NICE or NICHE documents used in her future projects, "since so much of that material comes straight from the work I did earlier." (ECF 52 at 4.) Wilder continued, "When you sent me the slides you'd presented at the community college conference with you as sole author—and no mention of me—I was shocked at first and did not know quite how to respond. Many of your slides were taken verbatim from what I had written either in the proposal or in Blackboard, and I felt bad that you had not even acknowledged me." (Id.)

Wilder then broke down each of the 23 slides in Hoiland's Presentation, objecting not just that slides 8 to 13[6] were "taken verbatim from the text I wrote for the Blackboard course," but also complaining about the use of slides in which Hoiland had referred to the "goals of NICE," which "consists entirely of text I had written," data[7] Wilder had emailed to Hoiland,

[6] Slide 8 consists of the list of Blackboard Modules but does not include any Unit 7H Text.
[7] To the extent that Wilder argued to Hoiland that she was also entitled to "first dibs" on the data generated by the NICE program (ECF 52 at 2), the Court notes that data is generally not copyrightable, although compilations of data that display some originality in their composition and selection may be. See Feist Publications, Inc. v. Rural

summaries of the NICHE units, and descriptions of project workshops (which Wilder did not accuse Hoiland of taking verbatim). (Id.) Wilder concluded, ". . . I feel as if you are trying to take over a project that is mine. . . . I was genuinely surprised by the extent to which my NICHE and NICE work was used but not acknowledged in your presentation. I think the norm in this situation would be to include me as a co-author. I'm also disappointed that you're presenting on the data that were collected in response to my course design, and that I also have plans to present." (Id. at 4-5.)

Hoiland replied later that day, "I will respond to the issue of plagiarism raised in your email." (Id. at 3.) Hoiland explained that while the names and biographies of "people that were not present" were not included on the "Speakers" page for the conference, Hoiland had acknowledged that she was one of two PIs in her own speaker biography, had described NICHE during the Presentation, and had explained that she had entered into a project that Wilder had already developed. (Id.) She concluded: "While I realize none of what I said is in the PowerPoint and I acknowledge that I should have put this in writing in the slideshow, the slideshow is not published and I can assure you no one in the room thought that NICE was my project and each individual would have known your name and institutional affiliation. Clearly, I would not have sent the PowerPoint to you if my intention was to steal your work or take credit without acknowledging your work." (Id.)

Hoiland also acknowledged that she should have "included" the names of two other collaborators to the NICHE project, including a professor who had "created Unit 3" and another professor who created other unidentified units of NICHE. (Id.) Wilder herself had mentioned one of these professors' roles in creating those NICHE units in her email. (Id. at 4.)

---

Telephone Service Company, Inc., 499 U.S. 340, 347-48 (1991). Regardless, Wilder's copyright infringement claim here is based solely on the Unit 7H Text, not any NICHE/NICE data.

Hoiland continued, "My understanding of co-authorship is that it is for publications, and in the case of a presentation, published proceedings." (Id. at 3.) Hoiland concluded, "I asked you if you wanted to co-present [at CCCLA] and you said no, but you appreciate me asking you and that 'it's great that you're presenting' (email 7/27/18).[8] I believe I even sent the abstract to you when I submitted it last summer." (Id. at 4.)

Wilder replied, "I invited you to be a co-author on the NICHE/NICE paper because you have been instrumental in giving feedback and ushering faculty through . . . . Honestly, I was trying to be generous. Now, however, you've indicated that you're planning a sole-authored paper that builds on slides that I wrote and data that I was responsible for generating. You've also said that you're planning an extension of the NICE project based on the grant proposal that I conceived and wrote. You never once suggested that the extension of the grant might include me. I think it is time to wrap up this project and go our separate ways." (Id. at 3.) Hoiland replied that Wilder had misstated her future research plans and that she was "insulting my integrity based on misinformation and that goes beyond the grant or any presentations. . . . I am honest and ethical. When I make a mistake, I admit it (and I did), and owned up to not including citations and acknowledging that I should have included you as a co-author in the presentation. Again, you didn't mention it when I sent you my list of presentations so I was taken aback at your reaction this summer." (Id. at 2.)

Wilder replied, "But from my perspective, you have wrongfully asserted control of what rightfully belongs to me, and you have inaccurately portrayed what transpired. While you have apologized for the problems with the presentation, I think you should take some action to remedy this situation (such as writing to the organizers and requesting that they include my

[8] As noted, this email is not in the record. Accordingly, the Court does not consider its content in deciding the summary judgment motions.

name as a coauthor in their records, for example)." (Id. at 1.) Wilder also wrote that it appeared Hoiland was "now strongly motivated to maximize the use of the data that I was responsible for generating from the NICE project . . . (From my perspective, because I conceived and planned this research, I feel I should have first dibs on the data.) I am fine with other people using the materials from the NICE/NICHE faculty development program—and indeed, I'm flattered when they do—because faculty development has always been important to me and I want to disseminate the materials as widely as possible. However, this shift in focus in your proposed 'expansion,' coupled with your presentation at the community college, has left me feeling worried and distrustful." (Id.)

Wilder and Hoiland continued to correspond about wrapping up their working relationship on the NICE project. Hoiland wrote to Wilder, "At this point, I don't feel comfortable saying anything about this program. I want no part of any publications, presentations, or extension funding. . . . I have no intentions of doing anything with NICE other than do my part to complete the Final Report and finish the project. . . . If you want the website for the community [college] assessment conference changed, I can inquire." (ECF 53 at 5.) Wilder responded, "In terms of the community college presentation, I am just asking for recognition that I co-authored the presentation and for it to be part of the official record. . . . I could tell from your last email that you are very upset about the email exchanges we've had this past week, but I have also been reeling because of the terrible and helpless feeling that I haven't been given proper credit for my intellectual work. I, too, am very sorry things worked out this way and I hope we can go our separate ways in peace." (Id.)

Two days later, Hoiland replied that she had reached out to CCCLA with Wilder's photo and biography and asked that Wilder be added to the "official agenda" of the conference.

(Id. at 2.) Wilder responded, "I appreciate that you are trying to correct this mistake. It is the right thing to do, and I am grateful." (Id.) In the same email, however, Wilder also accused Hoiland of not making any "unique intellectual contribution" to the NICHE/NICE program and wrote: ". . . I was frustrated and hurt because you had included so many of my slides without providing any authorship credit. I am not just concerned about getting credit for my role in the project, although that is important. My main concern is more specific: approximately half the text slides that you presented were my work. How would you feel if you encountered a presentation/paper that included such a large proportion of your work, taken nearly verbatim, without attribution or permission?" (Id. at 2.) Wilder concluded, "I think your actions constitute a form of plagiarism. I have been hesitant to use that word because it is so loaded in the academic world, but that's what happened, and that's why it's so important that it be corrected. . . . In presenting yourself as sole author or first author, you have been presenting my intellectual contribution and asserting control over it. . . . I don't think I'm overreacting, since this is not just my personal opinion. Based on the content of your PowerPoint presentation, it's a matter of fact." (Id. at 2-3.)

Hoiland had, in fact, reached out to the organizers of the CCCLA on August 8, asking them to add Wilder's name to the online version of the conference agenda and explaining, "My co-PI, Esther Wilder, could not make it to the conference in February and pointed out that she should have been listed as a co-author. Would it be possible to add her?" She included Wilder's biography and photo. (ECF 36-13 at 6.) Wilder also followed up directly with the organizers in early September 2019, explaining that she was "inadvertently not given authorship credit for my role in this presentation." (Id. at 5.) She also explained "another significant problem with the presentation": the inclusion of Rodriguez's sample assessment instrument.

Wilder attached "a revised slideshow that properly credits Dr. Rodriguez's contribution to this presentation . . . and indicates myself as co-author. . . . In the absence of crediting Dr. Rodriguez in the slideshow, she should also be considered a co-author in this presentation." (Id.) The next day, the organizers explained that they had no record of the attendees who had attended Hoiland's session in order to circulate the updated PowerPoint to them; however, they did add Wilder's photo and bio to the conference's website. (Id. at 4.) Wilder then asked if they could add Rodriguez's name as an additional co-author but noted that she needed to "reach out to [Rodriguez]" first. (Id. at 4.) Three days later, Wilder wrote to Rodriguez—apparently their first communication on the subject—explaining the background surrounding Hoiland's Presentation, as well as Wilder's correspondence with Hoiland and with CCCLA. Wilder added, "I don't know if [Hoiland] reached out to you, but in my communication with her it seems that all of this was some big oversight." (Id. at 2-3.)

On September 10, 2019, when Hoiland asked Wilder to forward her communications with Valencia, Wilder responded, "I spoke on the phone with [Valencia] to explain why I felt it was important to remedy this problem—to grant authorship credit to both Crystal and myself. . . . As [Valencia] explained to me, it is really too late to revise the PowerPoint document. . . . However, the authorship issue has been resolved on Valencia's website, and I am very glad that both Crystal and I are getting the credit we deserve, albeit belatedly. (I have changed the citation on the NICHE/NICE website to reflect this.) Today I consulted with the chair of my department about this matter, as I thought it was appropriate that he be informed. . . . My chair thought it would be appropriate for me to consult with legal counsel, but I have not yet decided how to proceed." (ECF 36-15 at 2.)

4. CUNY Internal Investigation

Wilder ultimately filed formal complaints with CUNY officials, accusing Hoiland of academic misconduct and plagiarism and urging the committee to deny Hoiland both an upcoming promotion and tenure. (ECF 54, 55.) Wilder also sent an email documenting her complaint to John Tsapogas, identified as a "Director" at the Research Foundation of the City University of New York ("RF-CUNY") in his email signature. (ECF 55 at 1.) She "respectfully request[ed] that a letter documenting Sarah's plagiarism and her unwillingness to accept responsibility and apologize for her actions be included in Sarah's dossier. . . . If Hostos/CUNY does nothing about this, then I feel you are condoning unethical behavior and giving Sarah a free license to continue to advance her career making misuse of the intellectual work of others." (Id. at 4.) Tsapogas replied that he was busy coordinating the CUNY response to the COVID-19 pandemic (the date of the email is March 12, 2020) and that he was deferring to others to respond to her email, but no further response was produced. (Id. at 1.) In April 2020, Wilder wrote another email bringing her complaint to the Research Integrity Officer at Hostos College. (ECF 54.) She also accused Hoiland of "defam[ing]" her. (Id. at 4.)

A preliminary Inquiry was eventually undertaken by Dr. Yoel Rodriguez, the Research Integrity Officer at Hostos Community College. This Inquiry included separate interviews with Wilder and Hoiland and with the Research Integrity Officer at Lehman College. (ECF 81-4 at 3.) On September 10, 2020, Rodriguez emailed Wilder to inform her that, "[a]fter review, it has been determined that a[] [formal] Investigation is not warranted. Therefore, this matter will be closed . . . ." (ECF 57 at 2.) Wilder replied, "Thank you for the information. I will proceed through other avenues as the evidence clearly indicates that plagiarism has occurred." (Id.)

The accompanying report about the Inquiry characterized the matter as "more of an authorship dispute than plagiarism." (ECF 81-4 at 5.) Rodriguez concluded, "While it was not an easy decision, I did not find sufficient evidence to support an investigation into plagiarism. . . . It seems there was no previous agreement on what to disseminate / publish as a result of the NSF grant." (Id.) He also noted that Hoiland had been "forthcoming" and made no attempt to "hide" from Wilder what she had presented at CCCLA, instead sending her the exact Presentation she had given without changes. (Id.) He recommended that Hoiland sign a "Letter of Understanding" about being "mindful" and "aware" of intellectual property issues, not using Wilder's materials from other programs, providing citations and attribution where necessary, and attending further training. (Id.) Wilder asserts that Hoiland has never signed any such Letter of Understanding. (ECF 67 ¶ 50.) Hoiland, for her part, asserts that she would sign a Letter of Understanding if Wilder also signed it and if it included statements agreeing, among other things, that "[t]here is no evidence of plagiarism in my 2019 CCLA presentation and/or presentation materials" and that "[a]uthorship issues with respect to the 2019 CCLA presentation have been resolved and are sufficient." (ECF 70 at 3.)[9]

Finally, in September 2020—more than a year and a half after Hoiland's Presentation took place—Wilder wrote again to Valencia, asking if they could circulate the revised PowerPoint to all 200+ attendees of the entire conference. Valencia advised Wilder that this would not be possible. (ECF 69-7 at 2-3.) Wilder replied that she was concerned about attendees that might have downloaded the slides without attending Hoiland's presentation, adding, "I really want to ensure that everyone who saw that presentation knows it was mostly the work of Crystal and myself." (Id. at 2.)

---

[9] Hoiland also testified that in 2022, she emailed personnel from the ASA regarding whether Hoiland should make an ethics complaint ("COPE") against Wilder for pursuing the instant litigation. (ECF 37-5, Tr. 266:8-274:21.)

5. The Instant Action

In April 2021, Wilder registered a copyright in the Unit 7H materials that appeared in Hoiland's Presentation (the "Unit 7H Text"). (ECF 1-4.) Wilder did not register a copyright in any of the other sub-units or other NICHE/NICE materials. The two-page deposit copy that she submitted along with her copyright registration application was attached as an exhibit to her Complaint. (See ECF 1-3; ECF 36 ¶¶ 20-21.)[10] The date of first publication of the materials is listed as 2013.

In February 2022, Wilder filed this action against Hoiland for copyright infringement in the Eastern District of New York, and it was subsequently transferred to this District. Following the close of fact discovery and an unsuccessful reference to mediation, the parties filed cross-motions for summary judgment. Wilder also sought to seal or redact certain exhibits to declarations in support of Hoiland's summary judgment motion. (ECF 50, 64.) The Court denied Wilder's motion to seal or redact, with two exceptions, unopposed by Hoiland, to "exclude stray and irrelevant mentions of non-parties." (ECF 74 at 5.)

Summary Judgment Standard

On a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. In the case where both parties have moved for summary judgment, "a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the

[10] At her deposition, however, Hoiland identified the deposit copy as a document "given to me in this form as what Dr. Wilder had submitted for copyright," but noted that it appeared to be "bits and pieces of the assessment module" as it originally appeared in Blackboard, and she could not confirm whether it was the "full text of unit 7H" as it appeared in the original Blackboard modules. (ECF 37-5, Tr. 191:6-192:8.)

party whose motion is under consideration." Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citations omitted). "Even where both parties have moved for summary judgment, 'neither motion may be granted unless one party is entitled to it as a matter of law upon genuinely undisputed facts.'" Safeway Environmental Corporation v. American Safety Insurance Company, 2010 WL 331693, at *2 (S.D.N.Y. Jan. 28, 2010) (Pauley, J.) (quoting Rhoads v. McFerran, 517 F.2d 66, 67–68 (2d Cir. 1975) (per curiam) (citations omitted)). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Williams v. New York City Housing Authority, 572 F. App'x 23, 24 (2d Cir. 2014) (summary order) (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corporation, 475 U.S. 574, 587 (1986)).

Courts may decide copyright infringement claims at the summary judgment stage, finding either that copyright infringement occurred or could not have occurred as a matter of law. See, e.g., Acuff-Rose Music, Inc. v. Jostens, Inc., 155 F.3d 140, 143 (2d Cir. 1998) (affirming district court's bench trial on summary judgment record that copyright infringement claim failed as a matter of law because the work at issue "lacks originality and was therefore not protected by [plaintiff's] copyright"); Island Software & Computer Service, Inc. v. Microsoft Corporation, 413 F.3d 257, 262 (2d Cir. 2005) (affirming grant of summary judgment establishing copyright infringement); Boone v. Jackson, 206 F. App'x 30, 33–34 (2d Cir. 2006) (summary order) (affirming grant of summary judgment for defendants because "plaintiff could not establish as a matter of law the elements required to prove an infringement claim"). But if there are outstanding issues of material fact in the record as to the validity, ownership, authorship, or infringement of the copyright, then summary judgment must be denied. See, e.g., Urbont v. Sony Music Entertainment, 831 F.3d 80, 93 (2d Cir. 2016) (reversing grant of summary

judgment to defendants where plaintiff had established genuine issue of material fact about his ownership of copyright).

Courts have also decided affirmative defenses to copyright infringement, such as fair use, at the summary judgment stage: the Second Circuit has observed that the "mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues to be tried," and that while the "fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area," the analysis "does not protect the copyright holder from summary disposition of her claims where there are no material factual disputes." Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d Cir. 1991) (citations omitted). See, e.g., Authors Guild v. Google, Inc., 804 F.3d 202, 229 (2d Cir. 2015) (affirming district court's grant of summary judgment to defendants, finding fair use was established); Swatch Group Management Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 77 (2d Cir. 2014), as amended (affirming district court's sua sponte grant of summary judgment to defendants, finding fair use).

DISCUSSION

Although the parties make various arguments in support of their claims and defenses in their cross-motions for summary judgment, the Court need only reach two of the parties' contentions: (1) Hoiland's argument that Wilder does not own a valid copyright in the Unit 7H Text, a necessary element of Wilder's copyright infringement claim; and (2) assuming that Wilder does own a valid copyright, Hoiland's affirmative defense that her use was a fair use.

As noted, the Court will grant Hoiland's motion for summary judgment and deny Wilder's motion.

I. Copyright Infringement

To make out a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright and (2) copying of the constituent elements of the work that are original. Urbont, 831 F.3d at 88 (citing Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001)). The Court assumes without deciding that Wilder can demonstrate that there is no material issue of fact as to originality of the Unit 7H Text, but her motion nevertheless fails because there is a genuine issue of material fact regarding her ownership of a valid copyright in that text. The Court will therefore deny Wilder's motion for summary judgment.

A. Registration

To establish ownership of a valid copyright, a plaintiff may submit a certificate of copyright registration from the United States Copyright Office. "Production of a certificate of registration made before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright." Id. at 88–89 (citing 17 U.S.C. § 410(c)). But "a certificate of registration creates no irrebuttable presumption of copyright validity," and if "other evidence in the record casts doubt on the question, validity will not be assumed." Id. at 89 (quoting Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2d Cir. 2003)). See also Liebowitz v. Bandshell Artist Management, 858 F. App'x 457, 459 (2d Cir. 2021) (summary order) (first citing Urbont, 831 F.3d at 88–89, and then Carol Barnhart Inc. v. Economy Cover Corporation, 73 F.2d 411, 414 (2d Cir. 1985)) ("Although the party challenging

the validity of a copyright registration bears the burden of proof, that burden attaches only for presumptively valid copyrights; plaintiffs bear the burden of establishing that presumption.").[11]

As evidence of her ownership of a valid copyright, Wilder has produced a certificate of registration from the United States Copyright Office dated April 15, 2021. (ECF 1-4; ECF 36-2.) The certificate names Wilder as both the "author" and the "copyright claimant," and the "certification" names Wilder's attorney in this litigation. The answer to the inquiry "Work made for hire" reads "No." The deposit copy of the text—referred to on the certificate as "NICHE Unit 7H: QR Assessment Plan/Instrument"—is attached to the Complaint. (ECF 1-3; ECF 36 ¶¶ 20-21.)

Wilder asserts, and her certificate reflects, that the Unit 7H Text was completed in 2013 and that its first publication was on March 22, 2013. But she did not register her copyright in the work until April 2021. (ECF 36-2.) This is, of course, a span of more than five years, and so this certificate does not entitle Wilder's copyright to a presumption of validity. This does not mean, however, that the Court disregards the certificate or that the copyright is invalid. The copyright statute allows the Court to use its discretion in evaluating the evidentiary weight to be assigned to such a certificate. Troll Company v. Uneeda Doll Company, 483 F.3d 150, 154 n.5 (2d Cir. 2007) (quoting 17 U.S.C. § 410(c)) ("We recognize that the registration is not prima facie evidence of ownership because it was made more than five years after the first publication. Nevertheless, it may carry some evidentiary weight. . . . 'The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.'").

[11] Additionally, a district court itself may decide how the copyright laws apply to the material being considered. See Carol Barnhart, 773 F.2d at 414 (citation omitted) (holding that the district court "properly exercised the discretion conferred on him by 17 U.S.C. § 410(c). Once defendant's response to plaintiff's claim put in issue whether the [materials] were copyrightable, [the Court] correctly reasoned that the 'mute testimony' of the [materials] put him in as good a position as the Copyright Office to decide the issue," and noting that "it is permissible for the district court itself to consider how the copyright law applies to the articles under consideration").

Here, the Court accords only minor evidentiary weight to Wilder's certificate of copyright registration, given that Wilder did not register the text until two years after the alleged infringement and well into her dispute with Hoiland—far longer than five years after its first publication in 2013.

B. Evidence of Ownership

Because the copyright registration certificate produced by Wilder does not enjoy a presumption of validity, Wilder must still establish her ownership of a valid copyright over the Unit 7H Text. And evidence in the record, including evidence submitted by Wilder herself, indicates that she may not, in fact, be the valid owner of the copyright in that text. The summary judgment record evidence includes materials identifying the recipient of the NSF NICHE and NICE grants as RF-CUNY, as well as portions of NSF policies purporting to show that the "grantee" retains the copyright of works created under the NSF grant. Finally, "copyright notices" purportedly attached to the NICHE/NICE materials raise additional questions about who owns the copyright to these materials.

First, the NICHE and NICE abstracts in the record unambiguously state that the Research Foundation of the City University of New York is the awardee or recipient of the NSF grants (not Wilder and/or Hoiland individually). (ECF 37-4 at 2; ECF 46-4 at 2; ECF 46-10 at 2, 5.) Yet, despite this evidence, Wilder asserts, "Under the terms of NSF's grants, Plaintiff is the author of material created for the grant program and retains the copyright in that material (Ex. 21; Supp. Wilder Decl. ¶ 7.)." (ECF 82 at 3-4.) The paragraph of her supplemental declaration that Wilder cites in support of this assertion reads: ". . . I authored the majority of the instructions and guidelines of the NICHE faculty development program. I am the owner of the copyright of

most of these materials. Under NSF policy, the author of the materials produced under a grant retains the copyright in the materials." (ECF 80 ¶ 7.)

But the NSF policy produced by Wilder herself does not support this assertion. Wilder's attorney submitted a declaration stating that Exhibit 21, also referenced in Wilder's declaration, consists of a "true and correct copy of a printout of sections from the National Science Foundation 2019, Proposal & Award Policies and Procedures Guide . . . and a printout from a section from the National Science Foundation 2004 Chapter Four Grant Administration Highlights NSF 4-23." (ECF 81 ¶ 4; see also ECF 81-1.) Both of the hyperlinks to these pages contained in the declaration, however, result in a "Page Not Found" error when visited.[12] The first "printout" of the NSF Proposal & Award Policies and Procedures Guide is dated February 2019. The first page consists of the banner of the NSF website, the title "Proposal & Award Policies & Procedures Guide," the date "February 25, 2019," and the beginning of the Table of Contents.[13] The second page of the printout consists of a paragraph defining the term "Principal Investigator/Project Director (PI/PD)" and explaining the relationship between multiple PIs. There is then a heading, "2. NSF-Grantee Relationships," with nothing below it. (ECF 81-1 at 2-3.)

The third page of the printout reads, "Intellectual Property Rights. The National Science Foundation claims no rights to any inventions or writings that might result from its

[12] The Court notes, however, that the URL in the title of the last page of the printout (ECF 81-1 at 5), https://www.nsf.gov/pubs/gpg/nsf04_23/6.jsp, does work; it directs the user to the NSF's "Document Library," containing a policy dated September 2004, titled "Chapter VI - Grant Administration Highlights," which includes the text on page 5 of ECF 81-1.
[13] It is unclear why the policy dated February 2019 was produced here; while the infringement is alleged to have taken place during Hoiland's Presentation in February 2019, the other evidence in the record indicates that the NICHE grant under which the Unit 7H Text was written was issued in 2011 and would therefore likely be controlled by an earlier version of NSF policy, which the parties have not produced. Similarly, it is not clear why Wilder produced a 2004 version of the "Grant Administration Highlights," as noted below, or whether this 2004 policy was still in effect at the time that the NICHE grant was issued by the NSF or when the Unit 7H text was written.

fellowship or traineeship grants. However, fellows and trainees should be aware that the NSF, another Federal agency, or some private party may acquire such rights through other support for particular research. Also, fellows and trainees should note their obligation to include an Acknowledgement and Disclaimer in any publication. [END OF PROVISION.]" (Id. at 4.) There is no evidence in the record, however, that the NICHE or NICE grants are "fellowship or trainee grants"—the abstracts provided by the parties refer to each as a "Standard Grant" (see, e.g., ECF 37-4 at 2)—and so it is not at all clear that this policy would even apply to the NICHE and NICE grants.

Finally, the fourth page of the printout bears the title: "Source: National Science Foundation. 2004. Chapter IV – Grant Administration Highlights. NSF 04-23. September 2004. Source: https://www.nsf.gov/pubs/gpg/nsf04_23/6.jsp." (ECF 81-1 at 5.) Following the title on the fourth page of the printout is a paragraph with the heading, "L. Legal Rights to Intellectual Property," which reads: "NSF normally allows grantees to retain principal legal rights to intellectual property developed under its grants. This policy provides incentive for development and dissemination of inventions, software and publications that can enhance their usefulness, accessibility and upkeep. It does not, however, reduce the responsibility of researchers and organizations to make results, data and collections available to the research community." (Id.) There are then two footnotes about "grant transfer requests" and a link to "NSF Grant Conditions."

The quoted text merely supports the proposition that the NSF "normally allows grantees" to retain intellectual property rights for work created under its grants. There is no evidence in the record showing that this was the case for the NICHE/NICE grants. And even assuming that RF-CUNY, as the grantee, did retain its intellectual property rights to work created

under its NSF grant, this does not answer the question of whether Wilder (a CUNY employee, not an RF-CUNY employee),[14] is the owner of the copyright in the original portions of the Unit 7H Text.

Wilder does not explain by what path copyright ownership would pass, under this scenario, from RF-CUNY as the NSF grantee to her as the "author" of the work. Nor did the parties submit evidence that could answer this question—such as Wilder's employment contract with CUNY, which might clarify, for example, whether the Unit 7H Text would be considered a work for hire owned by CUNY or RF-CUNY;[15] any correspondence or agreements between RF-CUNY and NSF regarding the grants; the final award documents and agreements between RF-CUNY and NSF regarding the grants (the parties submitted only the NSF proposals for NICE); or the correspondence that Hoiland testified she had with RF-CUNY and NSF employees regarding the instant dispute. (ECF 37-5, Tr. 256:17-260:2.) Because the parties have not submitted any such documents—and because the documents that they have submitted raise more questions than they resolve on this issue—on the record before the Court, there remain questions about this material, threshold fact.

Finally, Wilder asserts repeatedly that the NICHE materials were "protected by copyright" and bore a copyright notice to that effect, giving her exclusive "authorization" over, or requiring her "permission" for, use of the materials. (See ECF 82 at 8 (internal citations omitted); ECF 36 ¶¶ 16-17; id. ¶ 59 ("Like the NICHE instructional materials, the videos in each unit of the NICE materials on Blackboard included a specific statement that they were subject to

[14] See Pl. 56.1 ¶ 1, Def. 56.1 Resp. ¶ 1 ("Plaintiff Esther Wilder ('Plaintiff') is a tenured professor in the Department of Sociology at Lehman College, City University of New York ('CUNY').").
[15] While the Copyright Act states that ownership of a copyright "vests initially in the author or authors of the work," the statute makes an "important exception" for "works made for hire." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (quoting 17 U.S.C. § 201(a)) (footnote omitted). "If the work is for hire, 'the employer or other person for whom the work was prepared is considered the author' and owns the copyright, unless there is a written agreement to the contrary." Id. (quoting 17 U.S.C. § 201(b)).

copyright and were not to be used without my [Wilder's] express authorization.").) In support of this assertion, Wilder produced a purported screenshot from the NICHE instructional videos on Blackboard. (ECF 36 ¶¶ 16-17; ECF 36-5.) Hoiland produced a slide deck for a presentation given by Wilder and Hoiland prior to her February 2019 Presentation, the final slide of which bears a nearly identical copyright notice. (ECF 37 ¶ 3; ECF 37-1 at 27.)

While Wilder asserts that each unit of the NICHE materials was protected by such a notice, there is no record evidence confirming that either of these notices were actually attached to the Unit 7H Text, and thus, whether the notices are even applicable or relevant here: the notice produced by Wilder consists of a single page or screenshot, while the notice produced by Hoiland is part of a NICHE/NICE slideshow not containing the Unit 7H Text.[16] But assuming that they were attached to Unit 7H—or that the Unit 7H Text is encompassed by the notices' reference to the "supplementary course material from NICHE" (ECF 45-3)—these notices do not identify Wilder as the owner of the copyright in those materials. Wilder's assertion that the notice states the materials are "protected by copyright" is accurate—but the notices do not state that the materials were protected by Wilder's copyright. The NICHE copyright notice reads:

> A CUNY Numeracy Infusion Course for Higher Education (NICHE) Presentation. . . . © Copyright 2013. This presentation is owned by CUNY NICHE. Unauthorized use of any of the material in this presentation or any supplementary course material from NICHE is strictly prohibited. Please note that all sources referenced in this presentation are indicated on our NICHE web site (www.teachqr.org). Any questions regarding the authorization for use of materials from NICHE should be directed to Esther Isabelle Wilder [Wilder's email address]. (ECF 36-5; ECF 45-3.)

[16] Hoiland also asserts that she does not recall seeing the copyright notices "as described by Dr. Wilder." (ECF 46 ¶ 126.)

The version produced by Hoiland is nearly identical, except that the title reads, "A CUNY NICHE/NICE Presentation," the first line of the notice reads, "© Copyright 2016. This presentation is owned by CUNY NICHE and CUNY NICE," and the final reference to "NICHE" in the last sentence has been updated to "NICHE/NICE." (ECF 37-1 at 27.)

These notices do not establish Wilder's ownership of the copyright in the material. Both notices explicitly identify CUNY NICHE and/or CUNY NICE as the owner of the "presentation." And assuming that the Unit 7H Text did bear such a copyright notice, these statements would contradict Wilder's own assertion that she owns the copyright. Hoiland concludes that this notice "is generally consistent with how I viewed the Course Materials in early 2019. I was not (and am not) an expert on copyright law, but I would have thought (as Dr. Wilder seems to have thought) that the Course Materials were owned by the NICE Project itself." (ECF 76 ¶ 129.)[17]

This record does not permit the Court to rule as a matter of law that Wilder is the owner of a valid copyright in the materials. Accordingly, the Court will deny Wilder's motion for summary judgment.

## II. Fair Use

Regardless of whether Wilder is the owner of a valid copyright in the material covered by the registration, Hoiland has established the affirmative defense of fair use as a matter of law.

The fair use doctrine provides "important limits to an author's rights to control original and derivative works." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 95 (2d Cir.

[17] In addition, as Hoiland notes, the notices do not go so far as to give Wilder "express authorization" over the materials—they merely forbid "unauthorized use" and direct questions about that use to Wilder. (Id. ¶ 131.)

2014). The doctrine "allows the public to draw upon copyrighted materials without the permission of the copyright holder in certain circumstances." Id. The four non-exclusive factors considered by courts in evaluating whether a use is fair include: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 527 (2023) (quoting 17 U.S.C. § 107). Fair use is an affirmative defense, and as such, Hoiland bears the burden of proof in establishing it. Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994); Authors Guild v. Google, 804 F.3d at 213 (citations omitted). The doctrine is a "flexible" one whose "application may well vary depending on context" and that "requires judicial balancing, depending on relevant circumstances." Andy Warhol Foundation, 598 U.S. at 527 (citation omitted). The Court will evaluate each factor in turn.

A. The Purpose and Character of the Use

The first factor in the fair use analysis is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." Id. at 527 (quoting 17 U.S.C. § 107(1)). "This factor considers the reasons for, and nature of, the copier's use of an original work. The 'central' question it asks is 'whether the new work merely "supersede[s] the objects" of the original creation . . . ("supplanting" the original), or instead adds something new, with a further purpose or different character.'" Id. at 527-28 (citations omitted). "The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or 'supplan[t],' the work." Id.

(citations omitted). "[T]he critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created." TCA Television Corporation v. McCollum, 839 F.3d 168, 180 (2d Cir. 2016) (citing Campbell, 510 U.S. at 579), cert. denied, 581 U.S. 994 (2017).

"An important focus of the first factor is whether the use is 'transformative.'" HathiTrust, 755 F.3d at 96. See also Authors Guild v. Google, 804 F.3d at 214 ("[T]ransformative uses tend to favor a fair use finding because a transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge.").[18] Academic, non-commercial uses are more likely to be found to be fair uses than commercial uses: "[C]ourts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest. The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." American Geophysical Union v. Texaco Inc., 60 F.3d 913, 922 (2d Cir. 1994) (citations omitted).

Here, the purpose and character of Hoiland's use of the Unit 7H Text was distinctly different from Wilder's stated original intent and purpose in creating the text. It was also a non-commercial, educational use that benefitted the public interest.

Wilder asserts that the Unit 7H Text was originally "designed to teach faculty at CUNY about the best practices for infusing quantitative reasoning into their courses, and the assessment of that instruction," (Pl. 56.1 ¶ 4), and that "Unit 7H provided instructions to faculty

[18] The Second Circuit has explained that "[w]hat is critical" to this inquiry is "how the work in question appears to the reasonable observer" and that courts must "examine how the [purported fair use] may 'reasonably be perceived' in order to assess [its] transformative nature." Cariou v. Prince, 714 F.3d 694, 707 (2d Cir. 2013) (citations omitted).

on preparing a QR assessment plan and instruction in accordance with the learning goals," (id. ¶ 10). (See also id. ¶ 31 ("Upon completion of the instructional units, the faculty participating in NICE (like in NICHE) were required to develop instructional and assessment materials to incorporate into their teaching.").) In other words, the original purpose of the Unit 7H Text, according to Wilder herself, was to provide instruction and guidance to the CUNY faculty participants on composing their own assessment instruments as an assignment for the course, as well as explaining best practices for teaching and assessing QR.

In contrast, in the abstract she submitted to Valencia, Hoiland described the objectives of her Presentation as not just "[t]o share best practices in faculty development related to assessment," but also "[t]o disseminate assessment results of our QR/QL faculty development program" and "[t]o discuss the challenges and successes related to assessment in the community college context." (ECF 46-7 at 2.) She also wrote that she would "discuss how faculty develop QR learning goals, QR assignments, and QR assessments in this 8-week program and will present preliminary assessment results . . . in addition to the external assessment of the program that took place." (Id.) In accordance with this objective, Hoiland testified that the slides themselves, including the slides that contained the Unit 7H Text, were merely visual aids for her overall presentation: "there was a much larger story that I was telling. The slides were not the focus of the presentation." (ECF 37-5, Tr. 136:17-20.) Hoiland also testified that the audience members asked questions "almost wholly unrelated to the slides themselves" during a lengthy question-and-answer session during the presentation. (Id., Tr. 138:2-3.)

Hoiland recalled that the audience's questions reflected that they "were not interested in the particularities of the NICE program. They had different kinds of questions. So the audience was predominantly community college faculty and their questions were more

related to things like how did you recruit faculty? How much did you pay them? How did you get faculty to complete work when they're teaching four or five classes. Like what are some best practices related to, you know, working with a four year institution." (Id., Tr. 137:14-25.) She also testified that she "did not plan to read the slides, stay on the slides, get into the nitty-gritty of the assessment unit but rather provide an overview of how the faculty development program approaches assessment." (Id., Tr. 200:7-19.)[19] The internal Inquiry undertaken by CUNY also reported that Hoiland said she had "talked more about Dr. Wilder than the assessment topic itself" during the Presentation, and that "much of the discussion in the presentation was about how to recruit and keep faculty motivated in professional development." (ECF 81-4 at 4.)

Wilder, in fact, reinforces the different character and purpose of Hoiland's use when she repeatedly argues that she "never would have agreed" to the use Hoiland made of the materials because they were for a different audience, "context," and purpose than what she had originally intended. (See, e.g., Pl 56.1 ¶ 120 ("Plaintiff would not have consented to the duplication of the Copyrighted Work, a unit of the NICHE and NICE programs out of context, leading to a misleading impression of the programs.").) In fact, Wilder cites to Hoiland's own deposition testimony to argue this very point: "The attendees of the CCLA Conference were interested in the procedures for recruiting faculty and interactions between the institutions, not the instructional materials comprising the Copyrighted Work." (Id. ¶ 82 (citing ECF 37-5, Tr. 137:14-138:12).)

This therefore was a use that was transformative rather than a "usurping" infringement of the original work. Both the audience and the nature of Hoiland's use were

[19] Hoiland also testified that originally, she had placed all the text onto two slides, knowing that they would only be used as a "quick visual" by the audience—indeed, she stated that she used "a lot of text specifically because [she] didn't plan to spend very much time on those slides"—but that the Valencia organizers asked her to break the text into additional slides. (Id. at 200:7-201:21.)

different than Wilder's original use and purpose of the Text. Indeed, Wilder's argument that Hoiland presented the work in a context or to an audience different than the one she initially intended is a key factor in determining that a use is transformative. See Cariou, 714 F.3d at 709 (emphasis added) ("an accused infringer has usurped the market for copyrighted works . . . where the infringer's target audience and the nature of the infringing content is the same as the original"); id. (concluding that fair use was established where the defendant's "audience" was "very different" from plaintiff's, did not affect the markets for plaintiff's work, and consisted of an "entirely different sort of [purchaser]" than plaintiff's); Arica Institute, Inc. v. Palmer, 970 F.2d 1067, 1076 (2d Cir. 1992) (affirming summary judgment finding establishment of fair use where defendant's secondary work, quoting from the plaintiff's work, "introduce[d] the historical and theoretical underpinnings" of plaintiff's theory, but also discussed defendant's own experiences and research, "build[ing] upon [plaintiff's] work to further develop our store of knowledge in this area").

Hoiland's use of most of the Unit 7H Text verbatim does not control the question of whether her use was transformative. In some cases, reproduction of an entire work has been found to be transformative. Authors Guild v. Google, 804 F.3d at 221 (footnote omitted) ("Complete unchanged copying has repeatedly been found justified as fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in such a manner that it did not offer a competing substitute for the original."); see also Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613, 615 (2d Cir. 2006) (concluding that reproduction of entire image by secondary user, albeit at a reduced size, was "tailored to further its transformative purpose" and did not weigh against fair use, and ultimately concluding use was fair).

The portions of the two-page Unit 7H Text that Hoiland did not use in the Presentation bear on the transformative use of the Presentation. The most significant change Hoiland made was to delete the first third of the Text, more than half of its first page—all instructional material for the Blackboard attendees of the course (such as deadlines and instructions for peer review). None of this would have been relevant for the audience of Hoiland's Presentation, who were not enrollees in the course and were not submitting assignments; the deletion of these portions accords with Hoiland's distinct purpose in showing them the text.

Hoiland also made several other minor changes throughout the text, such as replacing a short parenthetical explanation with a longer one citing specific examples on slide 9; changing "lesson/assignment" to "learning goals" on slide 10; and adding emphasis to the font on certain portions of slides 12 and 13. (Compare ECF 1-3 at 1, 2 with ECF 1-5 at 10-14.) Hoiland testified that she added the words that appear in color on slides 10 and 13 alongside the Unit 7H Text—her own commentary and takeaways on the course material for the audience to whom she was presenting. (ECF 37-5, Tr. 93:13-15, 94:21-23; see ECF 1-5, 41-9 at 11 ("Keep it simple: pre/post, three questions, and a scoring rubric"); id. at 14 ("Clarity, alignment, generalizability, validity, and soundness")). Although Wilder argues, correctly, that "[a]dded value or utility is not the test" (ECF 82 at 23), but rather that the use "serves a new and different function" that is not a "substitute" for the original work, that new and different function was present in Hoiland's Presentation of the materials to a totally different audience. HathiTrust, 755 F.3d at 96. For example, the Second Circuit ultimately concluded that this first factor favored fair use where, although information "disseminated by [defendant] was identical to what [plaintiff] had disseminated, the two works had different messages and purposes," and where

defendant's purpose was to disseminate the work to a different audience than plaintiff had intended. Swatch, 756 F.3d at 84-85.

Finally, considering Hoiland's Presentation as a whole, while the Unit 7H Text appears on 5 of 23 slides, there is other content in the Presentation that gives Hoiland's inclusion of the Unit 7H Text greater context. For example, Hoiland's stated purpose in including Crystal Rodriguez's assessment instrument within the Presentation (slides 14-19) was to "showcase" a completed assignment by one of the NICE faculty participants. This choice further differentiates her purpose from the original purpose of the Unit 7H Text, which, as noted, was to provide instruction for faculty participants to create their own assessment instruments. Hoiland's Presentation also included "student reflections" from other faculty participants, an apparent summary of challenges she and Wilder faced during the project, and a summary of a two-day workshop. (ECF 1-5.)[20] The inclusion of these materials allows the Presentation to achieve its overall purpose of providing an overview of the NICHE/NICE project to an audience who was previously unfamiliar with it and gives context to Hoiland's reason for including the Unit 7H Text within that Presentation.

This difference in purpose and the editorial changes made by Hoiland for this purpose thus distinguish the facts here from cases such as Weissman, in which the scholarly article in question was prepared for the same type of audience and had the "same intrinsic purpose"—and where the infringer only changed the author's name and some words in the title of the article before distributing it without any additional changes. Weissmann v. Freeman, 868 F.2d 1313, 1316, 1324 (2d Cir. 1989) (citations omitted) (observing that infringer's use of

[20] As noted, Wilder initially also claimed that much of this content was also "hers," such as text she had written describing the goals of NICE, but also, for example, the workshop she had "planned" (while not claiming that she had written the text about the workshop). (ECF 52 at 5.) Again, however, her copyright infringement claim is limited here to the Unit 7H Text.

professor colleague's work for the exact "same intrinsic purpose" "seriously weakens a claimed fair use"); cf. Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57, 61 (2d Cir. 1980) (quoting 3 Nimmer on Copyright § 13.05(B), at 13-58) (footnote omitted) (emphasis added) ("'(W)here the two works in issue fulfill the same function,' we are instructed by Professor Nimmer, the 'scope of fair use is . . . constricted.'").

Hoiland's purpose thus was educational—to share the experience of the NICE and NICHE programs with an audience of community college professors and to explain how to set up such a faculty development program. And it was also non-commercial—Hoiland testified that attendees generally pay, rather than receive payment, to attend conferences of this type, and that she received no payment for speaking at CCCLA. (See ECF 37-5, Tr. 80:8-11; id., Tr. 178:15-25; ECF 76 ¶ 83.). Although, as discussed further in the Court's analysis of the fourth factor, in the academic context, professional benefits should be taken into consideration as well as monetary gain, here, there is little record evidence that would directly connect any professional achievements by Hoiland that occurred post-CCCLA with this sparsely attended Presentation in 2019. (See, e.g., ECF 37-5, Tr. 81:9-82:11 (Hoiland testifying at deposition that she did not get contact information or have follow-up conversations with any of the attendees of the Presentation and that she has a "few dozen" similar presentations on her CV).) The Court concludes that Hoiland's use was transformative and that the educational, non-commercial purpose for which she used the work weighs heavily in favor of fair use.[21]

[21] The parties also argue that the fair use analysis should consider "the propriety of the defendant's conduct." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985) (citation omitted). Wilder argues that by "[o]mitting Plaintiff's authorship credit and substituting her own name, Defendant's copying raises the inference of bad faith," (ECF 34 at 19), while Hoiland argues that Wilder herself has "engaged in a multi-year, bad-faith campaign designed to destroy Dr. Hoiland's career," (ECF 43 at 24). Despite the parties' emphasis on the issue, however, the Supreme Court has cast doubt on "whether bad faith has any role in a fair use analysis" and noted it was "not determinative" in that case. Google LLC v. Oracle America, Inc., 141 S.Ct. 1183, 1204 (2021) (citations omitted). To the extent that it does play a role, the Court notes that the report resulting from CUNY's internal investigation emphasized that Hoiland was "forthcoming" and did not "hide what was presented" at the

B. The Nature of the Copyrighted Work

The second factor asks whether the copyrighted work is, essentially, factual or fictional in nature, with greater copyright protection generally given to fictional works. See Harper & Row, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."). To the extent that the Unit 7H Text is not a work of fiction, this factor weighs in Hoiland's favor; however, "courts have hardly ever found that the second factor in isolation played a large role in explaining a fair use decision." Authors Guild v. Google, 804 F.3d at 220. Still, however, Wilder failed to address this factor at all in her initial summary judgment motion and acknowledges in her reply that the Unit 7H Text is "not a work of fiction," although it is also "not a collection of facts." (ECF 82 at 23). Although Wilder also notes, correctly, that this second factor rarely is independently significant to the fair use analysis, this factor also weighs in favor of Hoiland, given the nonfictional character of the work.[22]

C. The Amount and Substantiality of the Portion Used

The third factor asks how much of the original work was used and how substantial or significant these portions were. Analysis of this factor "will harken back to the first of the

CCCLA from Wilder. (ECF 81-4 at 5.) Hoiland also took steps to add Wilder's name to the CCCLA website within days of Wilder's request for her to do so. (ECF 36-13 at 6.) Hoiland's response on August 8, 2019, to Wilder's allegations was to explicitly state that she wanted "no part of any publications, presentations, or extension funding" for the program. (ECF 53 at 5.) Finally, while Hoiland calls attention to Wilder's requests to have her tenure and promotion denied, Wilder's behavior is not relevant here. See Harper & Row, 471 U.S.at 562-63.

[22] This factor may also consider whether the original work was "unpublished." See Harper & Row, 471 U.S. at 564 (explaining "the scope of fair use is narrower with respect to unpublished works"). Wilder does note, as part of her argument on the third factor, that "[u]ntil Defendant's presentation, [Unit 7H] was accessible only to faculty enrolled in the program." (ECF 34 at 18; see also ECF 82 at 23.) However, Wilder also states on her certificate of copyright registration that the work was "first published" on March 22, 2013. (ECF 1-4.) And the fact that the Unit 7H Text was made available to several "cohorts" of NICHE and NICE participants from 2013 to 2019 differentiates this case from Harper & Row, in which an unpublished, confidential manuscript was copied and published in a magazine. 471 U.S. at 543. Finally, the Copyright Act provides that the "fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the [] factors." 17 U.S.C. § 107.

statutory factors, for . . . we recognize that the extent of permissible copying varies with the purpose and character of the use." Campbell, 510 U.S. at 586-87 (citations omitted). The analysis must consider "not only . . . the quantity of the materials used, but . . . their quality and importance, too." Id. at 587. For example, "even a small amount of copying may fall outside of the scope of fair use where the excerpt copied consists of the 'heart' of the original work's creative expression. On the other hand, copying a larger amount of material can fall within the scope of fair use where the material copied captures little of the material's creative expression or is central to a copier's valid purpose." Oracle, 141 S.Ct. at 1205 (citations omitted). "[W]hether 'a substantial portion of the infringing work was copied verbatim' from the copyrighted work is a relevant question, for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth; a work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original." Campbell, 510 U.S. at 587–88 (quoting Harper & Row, 471 U.S. at 565). But this "'substantiality' factor will generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative, purpose." Oracle, 141 S.Ct. at 1205.

As a threshold matter, here, both parties misapply their analyses of this factor by focusing on (1) the percentage of Hoiland's Presentation that used the Unit 7H Text (and the brevity with which it was displayed), and (2) the role of Unit 7H within the NICHE/NICE program as a whole. First, Hoiland argues that she did not use the Unit 7H Text in "any substantial way" during her Presentation and that she only "fleetingly" showed the slides on screen. (ECF 75 at 23.) Wilder, too, incorrectly focuses on Hoiland's Presentation, arguing that Hoiland "dismissed the importance of copying the text" when she explained that she "used the

slides as a quick visual, [and] that she did not intend to, and did not, discuss the text on the slides beyond a passing reference to the slides." (ECF 34 at 19.) But the correct focus is on the portions of the copyrighted text used, not the percentage of Hoiland's Presentation that included the Unit 7H Text. See NXIVM Corp. v. Ross Institute, 364 F.3d 471, 480 (2d Cir. 2004) (quoting 17 U.S.C. § 107(3)) ("the statutory enumeration of the third factor plainly requires only an analysis 'in relation to the copyrighted work,' not the infringing work"); see also Harper & Row, 471 U.S. at 565 (citation omitted) ("As the statutory language indicates, a taking may not be excused merely because it is insubstantial with respect to the infringing work. As Judge Learned Hand cogently remarked, 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate.'").

Second, Hoiland argues that Unit 7H itself was not the "heart" of the NICHE/NICE materials, that the topic of Unit 7H, assessment, is "not the core of the NICE Project" overall, and that Unit 7H itself comprises "between 1/40th and 1/80th of the Course Materials" (i.e., of all eight units of the NICHE/NICE materials)—and that she therefore used neither the "heart" of the materials nor a substantial amount of them. (ECF 75 at 23.) Wilder counters that the topic of assessment was indeed an important part of the NICE and NICHE programs overall. (ECF 82 at 23.) But the analysis under this factor may not take into account the relative significance of Unit 7H to the full eight-unit set of NICHE/NICE materials because Wilder has only copyrighted the Unit 7H Text—not the entirety of the NICHE/NICE course materials. (See ECF 1-3, 1-4.) Nor has Wilder claimed to have authored the entirety of all the units that comprise NICHE/NICE. (See, e.g., ECF 80 ¶ 7 (emphasis added) ("As part of my duties at NICHE, I authored the majority of the instructions and guidelines of the NICHE faculty development program. I am the owner of the copyright of most of these materials.").)

The correct analysis focuses on the percentage and significance of the portion of the copyrighted Unit 7H Text that Hoiland used in her Presentation compared to the entirety of the Unit 7H Text itself. Here, Hoiland used about two-thirds of the text in the deposit copy, excising portions such as the instructions for submitting assignments and other changes, as discussed above. Utilizing such a large percentage of the work, however, is not dispositive, as courts in some instances have found copying of an entire work to constitute a fair use. See, e.g., Bill Graham, 448 F.3d at 613 (citations omitted) (noting that "courts have concluded that such copying does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use . . ." and concluding that "the third-factor inquiry must take into account that . . . 'the extent of permissible copying varies with the purpose and character of the use'").

The key question, then, is what constitutes the "heart" of the Unit 7H Text. The portions of the Unit 7H Text that Hoiland did not include in her Presentation are those targeted to the very audience Wilder intended—the NICHE/NICE faculty participants who were submitting their assignments for this unit. This text includes the background for the later portions of the text, and includes step-by-step instructions for the faculty participants, including deadlines, submission instructions, and discussion of peer feedback. (See, e.g., ECF 1-3 at 2.) Hoiland's alteration of the original text therefore consisted of cutting out much of the Unit 7H Text that would have been "essential" or the "heart" of the work under Wilder's own view of the work's purpose—to guide CUNY faculty members enrolled in NICHE/NICE to draft their own assessment instruments. (See, e.g., Pl. 56.1 St. ¶ 10 ("Unit 7H provided instructions to faculty on preparing a QR assessment plan and instruction in accordance with the learning goals."); id. ¶ 31 ("Upon completion of the instructional units, the faculty participating in NICE (like in

NICHE) were required to develop instructional and assessment materials to incorporate into their teaching.”).) This is not to say, however, that the portions of the Unit 7H Text that Hoiland did use are insignificant; they are, of course, important substantive guidelines the participants were to consider in crafting their own assessment instruments. This third factor tends slightly in favor of Wilder.

D. Effect Upon the Market

The fourth factor examines the use’s effect upon the market for the original work. “It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also ‘whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market’ for the original.” Campbell, 510 U.S. at 590 (citation omitted). The Supreme Court has referred to this as “undoubtedly the single most important element of fair use.” Harper & Row, 471 U.S. at 566 (footnote omitted). “To defeat a claim of fair use, the copyright holder must point to market harm that results because the secondary use serves as a substitute for the original work.” HathiTrust, 755 F.3d at 96. However, “the market effect must be evaluated in light of whether the secondary use is transformative.” On Davis v. The Gap, Inc., 246 F.3d 152, 176 (2d Cir. 2001) (citing Campbell, 510 U.S. at 591), as amended. But “[e]ven if the purpose of the copying is for a valuably transformative purpose, such copying might nonetheless harm the value of the copyrighted original if done in a manner that results in widespread revelation of sufficiently significant portions of the original as to make available a significantly competing substitute.” Authors Guild v. Google, 804 F.3d at 223–24.

The fact that Hoiland's use took place in an academic context adds an additional layer to this analysis. Ordinarily, this factor is evaluated in terms of the commercial or financial impact on the market. But the Second Circuit has specifically identified publication in the academic setting as a special context in which non-monetary rewards are perhaps more valuable than financial earnings, noting that it would be error to consider only "sales or dollars received, rather than . . . the realities of promotion and tenure in an academic setting" and how the secondary use of the work might damage the original author's academic career. See Weissmann, 868 F.2d at 1326. Wilder emphasizes this argument, alleging that "Defendant's presentation, and representation of the Copyrighted Work as her own, benefited her academic resume and could inhibit Plaintiff's ability to publish and present about her work, now presented to academia as Defendant's intellectual property." (ECF 34 at 19.)

But according to Weissman, the correct focus here is not on Hoiland's promotion of her own career but on any detriment to Wilder's own publications, promotions, or incentives to continue her scholarly research. See Weissman, 868 F.2d at 1326. Wilder's claims of reputational or professional harm in the one-time use of the material in the 2019 Presentation to a "breakout" session within a community college conference is speculative at best. Wilder claims that Hoiland's use could hinder her plans to "commercialize the NICHE materials" in a textbook, and that Hoiland's use may also result in confusion about the true author of the work. (See ECF 36 ¶¶ 103-05.) This potential harm, however, runs into a roadblock: the Unit 7H Text is the only portion of the NICHE materials for which Wilder currently owns a copyright. (ECF 1-3, 1-4.) To the extent that Wilder intends to publish the entire NICHE/NICE curriculum together as a textbook (which she describes as "including the Copyrighted [Unit 7H] Text," but not consisting entirely of the Unit 7H Text), she would first have to hold a valid copyright in each of the units

she intends to publish. See Harper & Row, 471 U.S. at 546–47 (citing 17 U.S.C. § 106) (footnote omitted) ("Under the Copyright Act, these [exclusive] rights—to publish, copy, and distribute the author's work—vest in the author of an original work from the time of its creation."); see also ABKCO Music, Inc. v. Harrisongs Music, Ltd., 944 F.2d 971, 980 (2d Cir. 1991) (citing 17 U.S.C. § 501(b)) ("The legal or beneficial owner of an exclusive right under a copyright is entitled to bring actions for infringements of that right occurring during the period of its ownership."). And other evidence in the record, as discussed, indicates that Wilder did not author every single Unit of the NICHE/NICE program. (See, e.g., ECF 80 ¶ 7.)

The potential market for the two-page Unit 7H Text, standing alone, would be limited—Unit 7H would have little commercial or professional value without the other units. (See ECF 36 ¶ 99 (Wilder stating that taking "the Copyrighted Work, one core instructional unit of the NICHE and NICE programs, out of context" would "lead[] to a confusing and misleading impression of the programs"); id. ¶¶ 102-04 (Wilder arguing that Hoiland's actions could adversely affect her commercialization of the "NICHE materials").) Still, to the extent that a market for the Unit 7H Text alone could conceivably exist, the fact that 12 to 20 participants briefly saw the words in a slideshow, and without any evidence that the text was further disseminated, does not represent a potential for substantial market harm for the Text. See Authors Guild v. Google, 804 F.3d at 224 (quoting 17 U.S.C. § 107(4)) ("But the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original. There must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'"). Moreover, the record reveals that, at Wilder's request, the CCCLA and NICHE websites were updated with her name as co-author—as well as

Crystal Rodriguez's name—which further mitigates any confusion as to Hoiland being the "sole" author of the text. (ECF 36-15 at 2; ECF 69-7 at 2.)

Also important to the analysis under this factor is that Hoiland's use, as discussed, was transformative. "[T]he Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a substitute for the original work. In other words, under Factor Four, any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work." HathiTrust, 755 F.3d at 99 (citations omitted). The transformative nature of Hoiland's use—particularly the distinct audience for which her Presentation was made—thus weighs in her favor here. See Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1264 (2d Cir. 1986) (concluding that plaintiff's "uncrystallized plans to publish a small second edition" of her work was not affected by defendant's fair use, including because "the two works served fundamentally different functions"). And while even a transformative use may harm the market if it consists of "widespread revelation of sufficiently significant portions" of the original that would "make available a significantly competing substitute," Authors Guild v. Google, 804 F.3d at 223–24, here there is no evidence of "widespread revelation" of the Unit 7H Text in any way that could compete with Wilder's original work. There is no record evidence that the Presentation was actually downloaded or viewed, nor that it was disseminated outside the conference attendees. (See Pl. 56.1 Resp. ¶ 114 (Wilder asserting it is "undisputed that no party conducted a forensic analysis of how many attendees of the CCLA Conference independently downloaded a copy of the CCLA PowerPoint that was made available to them through the CCLA Conference's website").) The text was shown only briefly, and the total number of people who attended the Presentation itself was no greater than twenty. Any

revelation of the Unit 7H Text was therefore not "widespread," and such revelation does not give rise to the possibility of a "significantly competing substitute" for any additional work planned by Wilder.

Finally, it is important to note that the statute provides that harm to any potential market for the original work be considered, even if the plaintiff has not yet exploited (or does not plan ever to exploit) the work in that market. See Salinger v. Random House, Inc., 811 F.2d 90, 99 (2d Cir. 1987). So Wilder's right to publish any original material for which she holds a valid copyright must be considered under this factor, regardless of whether or not she has yet done so. But as discussed, the potential market for that work is exceedingly limited and is not affected by Hoiland's Presentation.[23] And Wilder has alleged no harm to that potential market other than speculation. See Maxtone-Graham, 803 F.2d at 1264 (concluding plaintiff could not "credibly argue that the use of the quotations [from her work] has harmed potential markets for her work" where she was "unable to point to a single piece of evidence portending future harm" and where the secondary use was published "a full decade" after her book was first published, thus "mak[ing] any such claim far too speculative to sustain upon mere allegation").

Balancing these factors, the Court concludes that Hoiland's use of the Unit 7H Text was fair as a matter of law. No reasonable factfinder could fail to find in favor of Hoiland on her fair use affirmative defense on this summary judgment record. The use was transformative; it was educational and non-commercial; the work is nonfictional; and the use had little or no effect on the limited market for the work. And while Hoiland did use large portions

[23] Additionally, given the limited audience that attended Hoiland's Presentation, the lack of any record evidence that the Presentation was downloaded at all (let alone widely disseminated), and Hoiland's immediate, voluntary cessation of involvement in the project, the Court concludes that this is not the "type" of use that presents a threat to Wilder's market nor that can be categorized as "harmful," as this factor also contemplates. Cf. Fox News Network, LLC v. TvEyes, Inc., 883 F.3d 169, 180 (2d Cir. 2018) (concluding that fourth factor weighed against fair use because of harm to plaintiff's licensing revenues by defendant and by "similar service[s]" or "similar entities"), cert. denied, 139 S.Ct. 595 (2018).

of the Unit 7H Text verbatim, she did not use the entirety of the work, and edited the text in a way that was most relevant to her transformative purpose.

CONCLUSION

Wilder's motion for summary judgment is DENIED. Hoiland's cross-motion for summary judgment is GRANTED. The Clerk is respectfully directed to terminate the motions (ECF 33, 42), enter final judgment for the defendant, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
February 1, 2024

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
ESTHER WILDER,

Plaintiff,

22 **CIVIL** 1254 (PKC)

-against-

# JUDGMENT

SARAH HOILAND,

Defendant.
-----------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated February 2, 2024, Wilder's motion for summary judgment is DENIED. Hoiland's cross-motion for summary judgment is GRANTED; accordingly, the case is closed.

**Dated:** New York, New York
February 2, 2024

**RUBY J. KRAJICK**

**Clerk of Court**

**BY:** Negam Duld
**Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ESTHER WILDER,

Plaintiff,

-against-

SARAH HOILAND,

Defendant.
-----------------------------------------------------------x

OPINION AND ORDER

22-cv-1254 (PKC)

CASTEL, U.S.D.J.

Plaintiff Esther Wilder and defendant Sarah Hoiland filed cross-motions for summary judgment in this copyright infringement case. In an Opinion and Order of February 1, 2024 (ECF 85 (the "Order")), this Court granted summary judgment to Hoiland, concluding that she had made a fair use of Wilder's work. The Court also concluded that there were genuine issues of material fact about Wilder's ownership of the copyright that precluded granting her motion for summary judgment on her claim of copyright infringement. The Clerk of Court entered judgment accordingly on February 2, 2024. (ECF 86.)

On February 13, 2024, Hoiland submitted a request to the Court for a two-week extension of time to file her motion for attorneys' fees and costs under 17 U.S.C. § 504 and Rule 54(d). (ECF 87.) Hoiland requested the adjournment of this deadline, consented to by Wilder, because they were "in discussions to determine whether this matter can be settled without further Court proceedings, and the parties believe that a short extension of the current deadline will help facilitate those discussions." (Id.) The Court granted this request. (ECF 88.) On March 1,

Wilder, represented by new counsel, filed a motion asking the Court to alter or amend its judgment pursuant to Rule 59(e), Fed. R. Civ. P. (ECF 94.) Hoiland also filed a motion seeking an award of attorneys' fees on March 1. (ECF 91.) After Wilder filed her motion under Rule 59(e), Hoiland sought to "withdraw" her motion for attorneys' fees because it would be "rendered premature" by the Rule 59(e) motion. (ECF 101.) Wilder filed opposition briefing to Hoiland's attorneys' fees motion, to which Hoiland replied. (ECF 98, 99, 100, 103, 104.)

For the reasons set forth below, Wilder's motion pursuant to Rule 59(e) will be denied. Hoiland's motion for attorneys' fees will also be denied.

## I. WILDER'S MOTION TO ALTER OR AMEND THE JUDGMENT

The standards for motion for reconsideration under Local Rule 6.3 and altering or amending a judgment under Rule 59(e), Fed. R. Civ. P, are "identical." Burke v. Solomon Acosta & FASCore/Great West & MTA/NYC Transit Authority, 2009 WL 10696111, at *1 (S.D.N.Y. Apr. 23, 2009) (Castel, J.), affirmed sub nom. Burke v. Acosta, 377 F. App'x 52 (2d Cir. 2010) (summary order) (citation omitted). Motions to alter or amend a judgment are held to strict standards, "and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transportation, Inc., 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). Motions to alter or amend a judgment are not vehicles for the moving party to relitigate an issue the Court has already decided. Cordero v. Astrue, 574 F. Supp. 2d 373, 380 (S.D.N.Y. 2008) (Marrero, J.); see also Shrader, 70 F.3d at 257.

A motion for reconsideration may be granted based upon "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atlantic Airways, Ltd. v. National Mediation Board, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citation omitted); see also NEM Re Receivables, LLC v. Fortress Re, Inc., 187 F. Supp. 3d 390, 396-97 (S.D.N.Y. 2016) (Marrero, J.) (analyzing a motion for reconsideration under Rule 59(e), Fed. R. Civ. P., and Local Rule 6.3 under these three grounds). "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" Exxon Shipping Company v. Baker, 554 U.S. 471, 486 n.5 (2008) (quoting 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2810.1 (2d ed. 1995)). See also Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012), as amended (July 13, 2012) (citations omitted) ("It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple'. . . .").

Conceding that she is not offering any intervening change in law or newly discovered evidence, Wilder argues that the Court's judgment should be amended based on "clear error" and "manifest injustice." (ECF 95 at 7.) She urges the Court to reverse its grant of summary judgment to Hoiland on her fair use affirmative defense and to instead grant summary judgment in her favor on her copyright infringement claim. (Id.) For the reasons explained below, the Court declines to amend or alter its judgment. Wilder's motion will be denied.

A. Hoiland's Use Was a Fair Use

Wilder's main contention in her Rule 59(e) motion is that Hoiland's use of the copyrighted text at issue (the "Unit 7H Text") was not transformative and that the Court therefore should not have concluded that her use was fair. (Id. at 8-17.) Wilder also argues that the Court "misapprehended" the context of Hoiland's use and asserts that the written slides themselves, rather than the presentation Hoiland gave using the written slides, were "all that mattered" to the fair use analysis. (Id. at 1, 9.)

But whether a use is transformative is not dispositive to the fair use analysis. Rather, it is an element of the analysis under the first factor, "the purpose and character of the use." See Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith, 598 U.S. 508, 538 (2023) (explaining that a "use's transformativeness may outweigh its commercial character" as part of the first factor analysis); Swatch Group Management Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 84 (2d Cir. 2014) (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994)) ("While a transformative use generally is more likely to qualify as fair use, 'transformative use is not absolutely necessary for a finding of fair use.'"); Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 102 (2d Cir. 2014) (concluding that "providing access to the print-disabled is still a valid purpose under Factor One even though it is not transformative" and ultimately concluding use was fair).

Wilder herself concedes that transformativeness is not dispositive when she cites statistics about how often courts finding transformative uses "also held that the uses were fair." (ECF 105 at 7 (emphasis added) (citation omitted).) Even if Hoiland's use was not transformative, then, Wilder's confidence that the grant of summary judgment to Hoiland was error "as a matter of law" is misplaced. (ECF 95 at 17; see also id. ("Because Hoiland's Work

Was Not Transformative, the Work Could Not Have Been a Fair Use.").) As Hoiland notes, the fair use standard is "flexible," Warhol, 598 U.S. at 527, and other factors in the fair use analysis also weighed in her favor, not just the "transformative" element. (ECF 97 at 7-8.) Under the first factor, the Court also concluded that Hoiland's non-commercial, educational use weighed in her favor (ECF 85 at 29, 35); the second factor, the nonfictional nature of the work, also weighed in favor of fair use (which Wilder essentially conceded) (id. at 36); and the fourth factor weighed in Hoiland's favor as well (id. at 40-44).[1] And although Wilder argues that the Court committed error by placing the burden on Wilder to show market harm under the fourth factor rather than on Hoiland, who had the burden of proving her affirmative defense, Wilder misunderstands the Court's opinion. (ECF 105 at 8 n.4.)) The Second Circuit has granted summary judgment in favor of defendants based on "essentially unrebutted" evidence in the record that showed the plaintiffs' claimed financial harm was speculative or unlikely, as was the case here. HathiTrust, 755 F.3d at 100–01; see also Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1264 (2d Cir. 1986) (finding fair use where plaintiff could not "credibly argue that the use of the quotations has harmed potential markets for her work" because she was "unable to point to a single piece of evidence portending future harm").

But the Court also declines to alter its conclusion that Hoiland's use was transformative. Even if the Court accepted Wilder's argument that it should have considered the written presentation alone, divorced from all reference to the oral component of Hoiland's

[1] Wilder is also not correct that Campbell "abrogated" the significance of the fourth factor. (ECF 105 at 7 n.3 (quoting Campbell, 510 U.S. at 590 n.21).) See, e.g., Authors Guild v. Google, 804 F.3d 202, 223 (2d Cir. 2015) (citing Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 566 (1985)) ("Because copyright is a commercial doctrine whose objective is to stimulate creativity among potential authors by enabling them to earn money from their creations, the fourth factor is of great importance in making a fair use assessment."); Swatch, 756 F.3d at 90 (quoting Harper & Row, 471 U.S. at 566) (observing that "the Supreme Court described [the fourth] factor as 'undoubtedly the single most important element of fair use'"); Yang v. Mic Network Inc., 2022 WL 906513, at *1 (2d Cir. Mar. 29, 2022) (citations omitted) (summary order) ("The Supreme Court has stressed the importance of the first factor . . . and the fourth factor" of the fair use analysis).

presentation, its conclusion would not change. The Court did, in fact, consider the written slides themselves in determining that Hoiland's use of the text was transformative; the Order spent several pages discussing the specific changes Hoiland made to the Unit 7H Text and the other materials she included on the written slides and why those changes and inclusions made the written slides, as a whole, a transformative use of the Unit 7H Text. (ECF 85 at 32-35.) Wilder urges the Court to look at the five slides that incorporate the Unit 7H Text, but those slides cannot be considered in isolation—they must be considered in the context of the entire set of slides and Hoiland's purpose in creating those slides, which is the context in which the Court discussed the verbal portions of the presentation. (ECF 95 at 5-6, 12-17; ECF 105 at 4.)[2]

Finally, Wilder also dedicates only one sentence of her initial and reply briefs to her claim that the Court has committed manifest injustice, "respectfully tender[ing]" that the "errors" in the Court's opinion "will impose manifest injustice not just upon Wilder but upon the legions of academics who rely on this Court—the North Star of copyright law in this Nation—to protect their work from misappropriation." (ECF 95 at 7.) Wilder provides no further support for this assertion, and it fails to meet the "manifest injustice" standard, which "is, by definition, 'deferential to district courts and provide[s] relief only in the proverbial "rare case."'" Corsair Special Situations Fund, L.P. v. National Resources, 595 F. App'x 40, 44 (2d Cir. 2014) (summary order) (citation omitted). See, e.g., Hemstreet v. Greiner, 378 F.3d 265, 268-69 (2d Cir. 2004) (sua sponte granting reconsideration to prevent injustice upon introduction of new evidence that "call[ed] into question" the record upon which the court originally affirmed a grant

[2] And to the extent Wilder argues that publication and downloading of the slides constituted infringement, fair use is an affirmative defense that exempts Hoiland from liability for all of these alleged infringing uses. See Campbell, 510 U.S. at 590. The Court also did not overlook the publication of the presentation online for download by attendees in its Order. (See, e.g., ECF 85 at 6, 16, 43, 44.)

of a habeas petition); Anwar v. Fairfield Greenwich Ltd., 745 F. Supp. 2d 379, 383 (S.D.N.Y. 2010) (Marrero, J.) (granting reconsideration to prevent manifest injustice where "technicality" and unclear briefing caused court to dismiss negligence claims that were properly pled). "[A] judgment in a civil case does not constitute 'manifest injustice' where the movant's arguments for relief 'were available to the [party] below and [the party] proffer[s] no reason for [its] failure to raise the arguments.'" Corsair, 595 F. App'x at 44 (quoting In re Johns–Manville Corporation, 759 F.3d 206, 219 (2d Cir. 2014)).

Because Wilder has not demonstrated clear error or manifest injustice, the Court denies her motion for reconsideration of the Court's grant of summary judgment to Hoiland.

B. Ownership of the Copyright

Wilder also seeks to have this Court grant summary judgment in her favor on her claim of copyright infringement instead. The Court denies this request. Because the Court declines to reconsider its decision granting summary judgment to Hoiland on her fair use, the Court need not address Wilder's motion for it to reconsider granting summary judgment to Wilder.

Wilder's motion under Rule 59(e) is therefore denied.

## II. HOILAND'S MOTION FOR ATTORNEYS' FEES

Hoiland moves, pursuant to 17 U.S.C. § 505, for an award of attorneys' fees and costs. The Copyright Act provides, "In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable

attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The Supreme Court has held that this statute "clearly connotes discretion" to a district court and that there is no "precise rule or formula" for an award of fees in this context. Kirtsaeng v. John Wiley & Sons, Inc., 579 U.S. 197, 202 (2016) (quoting Fogerty v. Fantasy, Inc., 510 U.S. 517, 533-34 (1994)).

The Court has also cited "'several nonexclusive factors' to inform a court's fee-shifting decisions: 'frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence.'" Id. (quoting Fogerty, 510 U.S. at 534 n.19). "[O]bjective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted." Matthew Bender & Company, Inc. v. West Publishing Company, 240 F.3d 116, 122 (2d Cir. 2001). In appropriate cases, however, a fee award may be based on other conduct of the non-prevailing party, such as "bad faith in the conduct of the litigation." Id. at 125.

The motivation behind the Copyright Act's provision for an award of attorneys' fees to the prevailing party is to "encourage the types of lawsuits that promote [the] purposes" of copyright law: "encouraging and rewarding authors' creations while also enabling others to build on that work." Kirtsaeng, 579 U.S. at 204 (citing Fogerty, 510 U.S. at 526). The Supreme Court has concluded that "[n]o matter which side wins a case, the court must assess whether the other side's position was (un)reasonable" in determining whether it is appropriate to award attorneys' fees. Id. at 207. Hoiland urges the Court that an award of attorneys' fees and costs is appropriate here because Wilder's copyright claim was "objectively unreasonable," that Wilder had an "improper" motivation or ulterior motive for bringing the case, and that an award to Hoiland would "serve the goals" of compensation and deterrence. (See, e.g., ECF 92 at 13.)

But here, the circumstances that courts within the Second Circuit have found to justify an award of attorneys' fees are not present. For example, in Baker v. Urban Outfitters, the court granted attorneys' fees and costs to the defendant where the plaintiff, "rather than pursuing resolution of a fairly minor dispute in good faith . . . filed and maintained this suit in an attempt to extract a significant payment from perceived 'deep pocketed' defendants" and made allegations that he had "actual personal knowledge . . . were not true"; the court also found that plaintiff's claims were unreasonable, the "most obvious example" of which was "the fact that throughout the course of the action, he and his counsel maintained their demand for more than $260,000 in 'actual damages' on a claim that was shown fairly promptly not to be worth more than $3,896." Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 357 (S.D.N.Y. 2006) (Preska, J.) (citations omitted), affirmed, 249 F. App'x 845 (2d Cir. 2007) (summary order).

And in Video-Cinema Films, Inc. v. CNN, Inc., the court also awarded attorneys' fees for the defendant, finding plaintiff's case objectively unreasonable where "[n]one of the authority cited by Plaintiff . . . stood for the proposition that any use of the copyrighted material must be essential or an actual necessity to qualify as fair use" and where "Plaintiff's President and sole shareholder . . . devised an elaborate scheme to place himself in a position to sue the Defendants" by "spen[ding] ten hours watching television on the day of [subject of copyrighted film's] death trying to find as many potential targets of litigation as possible in the event that Plaintiff was able to buy the copyright to the film." Video-Cinema Films, Inc. v. Cable News Network, Inc., 2003 WL 1701904, at *4 (S.D.N.Y. Mar. 31, 2003) (Jones, J.). See also Mallery v. NBC Universal, Inc., 331 F. App'x 821, 823 (2d Cir. 2009) (summary order) ("The district court properly concluded that Plaintiffs' claims were objectively unreasonable, 'as the profound dissimilarity between their works and Heroes was indeed "obvious."' Given this conclusion, the

district court did not abuse its discretion granting Defendants' application for attorneys' fees."). This case does not present similar facts of bad faith, objective unreasonableness, or other factors warranting the need for an award of fees and costs to Hoiland.

The Court will therefore deny Hoiland's motion.

## III. CONCLUSION

Wilder's motion to amend or alter the judgment under Rule 59(e) is DENIED. Hoiland's motion for attorneys' fees and costs is also DENIED. The Clerk is respectfully requested to terminate the motions (ECF 91, 94) and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
April 24, 2024

17 U.S.C.A. § 107

§ 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C.A. § 201

§ 201. Ownership of copyright

(a) Initial Ownership.--Copyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work.

(b) Works Made for Hire.--In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

(c) Contributions to Collective Works.--Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

(d) Transfer of Ownership.--

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

(e) Involuntary Transfer.--When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect under this title, except as provided under title 11.

## CERTIFICATE OF SERVICE

I, Matthew Hersh, hereby certify that on August 5, 2024, I filed the foregoing Brief and Special Appendix for Appellant Esther Wilder, through this Court's CM/ECF system, that counsel for all parties are registered CM/ECF users, and that service of all parties will be accomplished through the CM/ECF system.

/s/ *Matthew Hersh*
*Counsel for Appellant-Cross-Appellee*
*Esther Wilder*